Peter Nelson *et al., Appellees,* v. The American Cement Plaster Company, *Appellant.*

No. 17,077.

SYLLABUS BY THE COURT.

1. Instructions—*Error Cured by Special Finding.* Error in the giving and refusal of instructions may be rendered immaterial by a special finding of fact where such finding is not induced by the failure to give proper instructions.

2. ———— *Same.* In an action to recover damages for the death of a person who it is claimed was in the employ of a mining company, the defendant answered that the mine was operated by the superintendent as an independent contractor under the terms of a certain written contract by which he was to hire and discharge all the workmen in the mine and to be paid by the company a stipulated price per ton for the gypsum rock delivered at the mouth of the mine, and was to have full supervision and control over the workmen, and that the defendant was to have nothing whatever to do with the workmen, the manner in which the work should be conducted, or anything that moved to the safety of the men while at work. *Held,* that the error in refusing to instruct that if the deceased was in the employ of an independent contractor no recovery could be had against the defendant, and the error in giving an instruction to disregard all the evidence tending to show that the superintendent was an independent contractor, were rendered immaterial by the special finding that the deceased at the time he was injured was in the employ of the defendant and that the superintendent was acting for the company.

3. Negligence—*Independent Contractor—Nominal Employment.* The law with respect to the negligence of an independent contractor rests upon the principle that one person should not be compelled to answer for the fault or negligence of another over whom he has no control. In actions to recover damages for the alleged negligence of the master, where the defense is that the negligence was that of an independent contractor, courts will not hesitate to look to the substance of the contract and all the circumstances in order to determine the actual relation which the owner of the property sustains to the persons employed. The mere fact of nominal employment by an independent contractor will not relieve the master of liability where the servant is in fact in his employ.

4. MASTER AND SERVANT—*Liability of Master—Colorable Agreement No Defense.* Whenever the court can say from all the circumstances that the contractor is not independent of the owner and that the contract, whatever its terms, is only a colorable arrangement or device to enable the master to avoid liability to his servants for the failure to perform a duty which the law imposes upon him, the defense that the injury was caused by an independent contractor should not be permitted to prevail, and the failure to submit such defense to the jury will not be deemed error.

5. CONTRACTS—*One Pleaded Held Not in Force.* In this case it is *held* that there was no substantial evidence showing that the written contract relied upon in the answer was in force or that the superintendent at the time of the accident sustained to the company the relation of an independent contractor.

Appeal from Marshall district court. Opinion filed May 6, 1911. Affirmed.

*A. C. Mitchell,* and *S. D. Bishop,* for the appellant; *Helvering & Helvering,* of counsel.

*J. G. Strong,* and *W. W. Redmond,* for the appellees.

The opinion of the court was delivered by

PORTER, J.: The American Cement Plaster Company owns and operates a gypsum mine and gypsum mill near the town of Blue Rapids, Kan. On the 23d day of July, 1908, Jesse Nelson, a boy about nineteen years of age, was killed while at work in this mine. The main tunnel or corridor of the mine extended in about a hundred feet where there were two rooms, one of these known as room one and the other as room two. In the operation of the mine it was intended that these rooms should be drifted side by side leaving a pillar or rib from sixteen to twenty feet wide between them for the purpose of supporting the roof and protecting the miners at work in one room from explosions in the other. On the morning of the accident the young man was directed to go to work in room two, picking up rock, without any warning that a shot was to be fired.

in the rib between the two rooms.   Just after he was
placed at work there another employee, by order of the
superintendent, placed a shot in room one, in the pillar
dividing the two rooms where the pillar or rib was not
to exceed four or five feet thick, with the result that
the explosion broke into room two, causing the instant
death of young Nelson.   This action was brought by
the parents of the boy to recover damages for his death
because of the negligence of the company.

The company in its answer denied that Jesse. Nelson
was in its employ at the time of the accident and alleged
that he was in the employ of one Jeb Jenkins, who it
claimed was an independent contractor.   The answer
further alleged that the mine and mills were formerly
owned by the Great Western Plaster Company, and
that on or about the 1st day of July, 1897, that company,
being then the owner of the mine, entered into a written
contract with John Messenger and Jeb Jenkins by the
terms of which Messenger and Jenkins agreed to do
all the work in the mine in a good and workmanlike
manner according to the plans and specifications to be
furnished by the company, and to deliver the gypsum
rock for the mill at the mouth of the mine at a stipu-
lated price per ton; that it was expressly agreed in the
contract that Messenger and Jenkins should employ
and discharge the men who worked in the mine and
have full supervision and control over them, and that
the owner of the mine was to have nothing whatever to
do with the men or the manner in which the work
should be conducted, or anything that moved to the
safety of the men in the work of getting out the rock.
The answer set out a copy of the written contract, and
alleged that about the year 1900 John Messenger with-
drew from the work and that Jeb Jenkins took over
and continued the work of furnishing the rock and
gypsum under the terms of the written contract, and
that after the purchase in 1907 of the mill property
and mines by the American Cement Plaster Company

he continued to work under and by virtue of the same contract and that no change had been made therein except that the price of rock per ton to be paid Jenkins had been changed from thirty-five to forty cents. In addition, the answer set up the usual defenses in actions of this kind, but these need not be considered.

In the reply the plantiffs denied that the company operated the mine under the contract set out in the answer. There was a trial before a jury and a verdict in favor of the plaintiffs in the sum of $6000, upon which the court rendered judgment, and the company appeals. With their verdict the jury returned the following special findings of fact:

"(1) Ques. Who was the superintendent of the mill of the American Cement Plaster Company at Blue Rapids on the 23d day of July, 1908? Ans. Ed Irvin.

"(2) Q. Who selected and employed men who were working in the mine on the 23d day of July, 1908? A. Jeb Jenkins and the American Cement Plaster Company.

"(3) Q. What workman fired the shot that caused the death of Jesse Nelson? A. Herb Newman.

"(4) Q. If you find that the workman that fired the shot was Herb Newman, you may state whether or not the said Herb Newman knew that Jesse Nelson was working or had gone to work in the adjoining room? A. He knew that he was ordered to go there.

"(5) Q. State who employed Herb Newman, fixed his wages and directed what he should do and where he should work. A. Jeb Jenkins.

"(6) Q. State the names of the other employees working with Herb Newman at the time the casualty occurred. A. One employee—name unknown to jurors.

"(7) Q. Who employed and directed what these men should do and where they should work? A. The American Cement Plaster Company employed them, through Jeb Jenkins, and Jenkins directed what they should do and where they should work.

"(8) Q. On the morning of July 23, 1908, did Mr. Jenkins instruct the deceased, Jesse Nelson, to work in the room with Herb Newman and another

man and tell him to remain in that room until he gave him other work to do?  A. Yes.

"(9)  Q. Did Jesse Nelson, on the morning of July 23, 1908, tell Marcy and Richardson that he was going to work in mine room No. 2?  A. No.

"(10)  Q. Did Marcy and Richardson tell him that it was dangerous to work in that room because Herb Newman was working for a break-through between the room in which Newman was working and room No. 2?  A. No.

"(11)  Q. What was the age of the deceased, Jesse Nelson, at the time of his death?  A. Nineteen years old.

"(12)  Q. Was he working for his parents at that time, and if so what was he contributing to their support?  A. He was working for the American Cement Plaster Company, for the benefit of his parents, and contributing his earnings to their support.

"(13)  Q. Prior to his employment in this mine, had he been living with his parents continuously, and what amount had he contributed to their support?  A. He was living with his parents continuously and contributed his earnings to his parents.

"(14)  Q. If you allow any damages to the plaintiffs in this suit, what amount do you allow for their loss of the service of Jesse Nelson between the date of his death and the time when he would have reached his majority?  A. One thousand dollars.

"(15)  Q. If you make any allowances for damages in this case, what amount do you estimate the expense his parents would have been to for his support and maintenance until he would have arrived at the age of 21?  A. Four hundred and thirty dollars.

"(16)  Q. If you allow any damages in this case to the plaintiffs, what amount do you allow to them as compensation for the loss of his services after he arrived at the age of majority?  A. Five thousand dollars."

It can not be seriously contended that the boy's death was not caused by the negligence of his employer.  He was put to work in an exceedingly dangerous place without any warning of his danger.  The wall in which

the shot was placed and fired should have been and was supposed by every one working in the mine to be from sixteen to twenty feet thick. In fact it was about five feet in thickness. It appears that the men themselves, working in the darkness except as that was illuminated by the small lamps carried in their caps, had no way of ascertaining with any degree of accuracy the directions in which the excavations were made. They could only guess as to the direction of the rooms and the thickness of the walls between. By an inspection and survey made from time to time as the work progressed the direction of the various workings could have been ascertained and the thickness of the walls and pillars could have been known. The duty of making such inspections and surveys rested upon the employer of the workmen, and this duty seems to have been wholly disregarded.

The principal errors assigned may be grouped as follows: (1) The failure of the court to submit to the jury the question whether Jesse Nelson at the time of the accident was in the employ of an independent contractor and not in the employ of the defendant company; (2) the refusal to instruct the jury that if they believed from the evidence that at the time of the accident the boy was in the employ of an independent contractor no recovery could be had against the defendant company; (3) the giving of an instruction in which the jury were told to disregard all the evidence tending to show that Jenkins was an independent contractor and that the boy was in his employ. The theory of the trial court appears from the following instruction, which is the one complained of:

"(2) You are instructed that the owners and operators of a mine and mills engaged in the business of producing and manufacturing plaster from gypsum rock secured from an underground mine by the ordinary process of mining, and which in its nature is dangerous to others, is under obligation to see that it is carefully performed so as to avoid injury, and such

Nelson v. Cement Co.

person or corporation can not delegate this obligation to an independent contractor and thus avoid liability in case the work and operation of said mining business is negligently done to the injury of a servant employed in such mining operations; and applying this rule to the case in hand the jury are instructed, that if you shall be satisfied by a preponderance of evidence that the said Jesse Nelson on the 23d day of July, 1908, while in the performance of his labors as a servant and miner in the mine of the American Cement Plaster Company, in Marshall county, Kansas, and without any fault or negligence on his own part, was killed by the explosion of a shot or blast which threw the gypsum rock into the room in which he was working, thereby dismembering his body and causing his death, and that such acts and results were from the negligence of the American Cement Plaster Company, its officers, agents and employees, as set forth in plaintiffs' claim of negligence, then you must find for the plaintiffs and against the defendant, regardless of any suggestion in the evidence toward the claim that said Jeb Jenkins was an independent contractor and solely liable for the negligence in the operation of said mine, if any such negligence existed."

The defendant relies chiefly upon the case of *Laffery v. Gypsum Co.*, 83 Kan. 349, which was an appeal from the same county to recover damages for the death of a miner in a gypsum mine, and the defense there was that the injury was caused by the negligence of an independent contractor who it was claimed by the mining company operated under a contract similar in its terms to the one set out in the answer in the present case. The same trial judge gave an instruction in language substantially identical with the instruction complained of here. The fifth paragraph of the syllabus in that case reads as follows:

"It can not be held, as a matter of law, that mining generally is so intrinsically or inherently dangerous as to make the owner of a mine liable for the negligence of an independent contractor resulting in injuries to a servant of such contractor, where it is not shown that the mine was unsafe when the contract was made or that the owner reserved some control of its operation."

It was further held that in such a case it was error not to submit to the jury the disputed question of fact whether the person who employed the workmen or superintended the operation of the mine was an independent contractor or superintendent for the owner. The present case was tried before that opinion came down. The theory of the trial court in both cases was the same, and it is obvious that the theory was erroneous and that the instruction should not have been given; and it is equally clear that the court should have submitted under proper instructions the question whether Jenkins was an independent contractor or acting as superintendent for the company.

We are satisfied with the decision in the Laffery case and with the rule there announced. But one question remains, which is whether that case controls the decision in this. There are two points upon which the present must be distinguished from that case and which in our opinion are sufficient to require an affirmance of the judgment. In the opinion in the Laffery case it was said:

"It will be observed that the jury did not find that Drake was superintendent of the mine *for the company*. They were not requested to find on that issue, although quite material." (83 Kan. 352.)

In the present case the jury did find that Jenkins was the superintendent of the mine for the company; that is, they found that the defendant company through Jenkins employed Newman, the man who fired the shot, as well as Nelson, the boy who was killed, and that Jenkins directed what they should do and where they should work. Unless this finding of the jury was induced by the erroneous instruction given, or the failure to give other instructions the error in the instructions is not ground for reversal. As to when error in instructions given will be regarded as immaterial because of findings made by the jury, see *A. T. & S. F. Rld. Co. v. English,* 38 Kan. 110; *Railway Co. v. Michaels,* 57 Kan.

474; and *Whitney v. Brown,* 75 Kan. 678. For cases holding that error in the refusal to give instructions is likewise rendered immaterial by special findings which destroy the claim upon which such instructions are predicated, see *Head v. Dyson,* 31 Kan. 74; *Mfg. Co. v. Nicholson,* 36 Kan. 383; *City of Kinsley v. Morse,* 40 Kan. 577; and *Sloan v. Pierce,* 74 Kan. 65. Neither the instructions given nor the failure to give other instructions could have induced the jury to find as they did. Therefore the decision might be placed upon the proposition that the error in the instructions was rendered immaterial by the special finding of the jury. We do not care, however, to rest the decision upon this ground alone.

The defendant pleaded a written contract which it alleged was in force with Jenkins, that by its terms expressly provided that Jenkins should operate the mine independently and furnish the company gypsum rock at the mouth of the mine at a stipulated price per ton, should employ and discharge his own workmen, and that the company should exercise no control over them or the conditions looking to their safety. If such a contract was in force and in fact Jenkins operated under it and was not in the defendant's employ, he was an independent contractor and the company should not be held liable for injuries to his employees caused by the negligent manner in which he operated the mine. (*Laffery v. Gypsum Co.,* 83 Kan. 349.) In our opinion there was no substantial evidence showing that the written contract relied upon was in force or that Jenkins at the time of the accident sustained to the company the relation of an independent contractor. The proof showed that this contract was drawn up and signed by the Great Western Plaster Company and Messenger and Jenkins eleven years before the accident in this case. It was executed July 1, 1897, when the mills and mine belonged to the other company. It is apparent from the evidence and all the circumstances

connected with the contract that it was entered into as
a scheme and subterfuge to enable the Great Western
Plaster Company to avoid its liability for injuries to
its employees caused by its own negligence.   Neither
Messenger nor Jenkins was possessed of any means
or capital.   That of itself would not make the contract
unlawful, but it is only one of several circumstances in-
dicating the purpose of the arrangement.   When the
alleged contract had been in existence about two years
the Great Western Plaster Company, acting through a
Mr. Paul, who was a part owner and superintendent of
the plant, discharged Messenger, and Jenkins contin-
ued to operate the mine to all appearances under the
same arrangement until 1904, when the contract was
taken up by the Great Western Plaster Company, on the
advice of its attorney, and because a suit had been
brought against it for an injury to one of the workmen
in the mine, and the scheme was apparently not work-
ing successfully.   If the company which owned the
mine and made the contract with Messenger and Jen-
kins retained outside of the written instrument the
right to discharge at will one of the parties to the con-
tract who was evidently a partner of the other, the con-
tractors were not independent but dependent upon the
company, and the written instrument was not what it
purported to be.   About two years after the written
contract had been taken up the Great Western Plaster
Company sold the entire plant to the defendant, and the
mine continued to be worked in the same way as before,
Jenkins hiring the men and the defendant company
paying them every two weeks in checks made out to
the individual workmen, the pay roll being kept by
Jenkins and furnished to the company.   The company
weighed the rock at the mouth of the mine and paid
Jenkins sometimes 40, sometimes 42½ and at other
times 45 cents per ton of rock, and charged him a
stipulated price for oil used in the miners' lamps and
for powder used in blasting.   The company owned the

Nelson v. Cement Co.

mules and furnished their feed. The testimony shows that the price paid to Jenkins per ton of rock was changed from time to time to allow for the difference he had to pay for wages of the workmen, so that in effect the company and not Jenkins took the risk of all fluctuations in the scale of wages caused by the supply of labor. When work in the harvest fields attracted the men and higher wages had to be paid, Jenkins was not so independent but that he could by merely asking obtain from the company whatever additional price per ton was required to make him whole. This plan was continued with the defendant company, and they had three prices which they paid him as the scale of labor demanded.

After this action had been brought a vigorous search was made by the superintendent of the defendant company, in which Jenkins assisted, for the purpose of finding the old contract. It was finally discovered, nailed in a box in the office at Blue Rapids. It had come ɔugh the flood of 1903 and portions of its provisions not legible. No officer of the company was willing �archive testify that he had seen it since the flood. A. Henley, president of the defendant company, was called as a witness to prove that this was the contract under which the mine was operated. He testified as follows:

"Ques. I will ask you to state, Mr. Henley, whether or not you had a contract with him by which he operated the mines at Blue Rapids? Ans. Yes, sir; we did.

"Q. You may examine the contract which I now hand you, which the stenographer has marked 'Exhibit F,' and state to the jury whether or not that is the contract which you had with him? A. Yes, sir; that is the contract. Soon after we took possession of the Great Western company I asked Mr. Jenkins if he would continue the same arrangement and on the same terms as he had been doing heretofore with the other company, that is, before we took possession, and he said he would, and the same arrangement was continued until he *quit the company's employ only a short time ago.*

"Q. Have you had any other or different contract with him? A. None whatever.

"Q. Is that the contract in your hands? A. This is the one."

It will be observed that Mr. Henley testified to a mere conclusion when he said "this is the one [contract]" under which Jenkins worked, and there is nothing in the testimony intimating that before this action was brought he ever saw the paper or was aware of its existence. That he had such a conversation with Jenkins is denied by the latter, but if we assume that the conversation took place as related, the written contract was not mentioned, and, according to the testimony of Jenkins and that of Paul, who was the superintendent of the Great Western company, the contract had been taken up years before that, and ever since Jenkins had been working along without any written contract. He may have agreed with Henley to continue to act as superintendent of the mine in the same way, so that there is no evidence that the written contract relied upon in the answer was in existence as a live contract at the time the accident occurred. Mr. Henley himself, inadvertently perhaps, referred in his testimony to Jenkins as an employee and said that the latter "quit the company's employ only a short time ago." It further appeared from the evidence that the company had taken out a policy of insurance indemnifying it for loss by reason of injuries to its employees. The plaintiffs introduced the policy in evidence. The estimated average number of employees engaged in the gypsum mine is therein stated to be twenty. The number of men actually employed in the mine varied from time to time. The pay roll showed about thirty so employed at the time of the accident. When the death of young Nelson occurred the defendant notified the insurance company of the claim for damages. Afterward, the insurance company procured from Jenkins a declaration of independence in the form of a written statement to the effect that he hired and discharged all the men, worked the mine under a contract, and that the company had

nothing to do with the miners.  Thereupon, the insurance company refused to assume any liability in the matter.  The inference is quite strong that the written contract was an afterthought and that the defendant intended to rely upon its arrangement by which Jenkins was to hire and discharge the men at the mine, and was to be paid a price per ton for the rock mined.  The arrangement, whether it was in writing as alleged in the answer, or merely verbal as Jenkins testified, had, we think from all the circumstances, but one purpose, which was to enable the defendant to escape liability for injury to its own employees arising out of negligence for which it would in law be responsible.  We have not been cited to any cases directly in point, nor have we been able to find any which present a similar state of facts.  The law with respect to the negligence of an independent contractor rests upon the principle that one person should not be compelled to answer for the fault or negligence of another over whom he has no control.  Where the owner of property places it in charge of a contractor who employs workmen and they are injured by the negligence of their employer, the owner can not be held liable because the workmen are not his servants and he is not their master; but there are exceptions to this rule arising in cases where the property or the manner in which it must be used is intrinsically and inherently dangerous.

The application of the rule with its exceptions as applied to cases of injuries received in the operation of mines is discussed and numerous cases are cited by Mr. Justice Benson in the opinion in *Laffery v. Gypsum Co.*, 83 Kan. 349.  The same principle was applied to a case not involving the relation of master and servant, where the owner was held liable for injuries to a third person on the ground that the work was in its nature dangerous to others and the owner owed a duty to the public. (*Railroad Co. v. Madden,* 77 Kan. 80.  For other exceptions to the general rule, see 16 A. & E. Encycl. of L. 199, 206.)  Numerous cases might be cited where the·

courts have held the owner liable notwithstanding an independent contract, where the owner retained the right to exercise a certain control over the method or manner in which the work should be done. These cases may be said to proceed upon the theory that the contractor was not in fact independent. Courts will not hesitate to look to the substance of the contract and all the circumstances in order to determine the actual relation which the owner of the property sustains to the persons employed. "The mere fact of nominal employment by an independent contractor will not relieve the master of liability where the servant is in fact in his employ." (26 Cyc. 971, and cases cited.)

Considering the case in this aspect as one of first impression, we think it is clear that courts ought not to permit the employer to avoid liability for injuries to his workmen resulting from his own negligence by a colorable arrangement such as this appears to have been. To hold thus would pervert a wise and useful principle of law to a purpose for which it was never intended. Whenever the courts can say from all the circumstances that the contractor is not independent of the owner and that the contract, whatever its terms, is only a device or scheme to avoid the liability of a master to his servants for his failure to perform a duty which the law imposes upon him, the defense that the injury was caused by an independent contractor should not be permitted to prevail.

For the reasons stated, the judgment is affirmed.

JOHNSTON, C. J. (concurring specially) : I concur in the judgment of affirmance and in the affirming opinion, except that part of it which expresses satisfaction with the rule announced in *Laffery v. Gypsum Co.*, 83 Kan. 349. In my view, mining is necessarily attended with danger, however carefully performed, and, being inherently dangerous, the owner is responsible for injuries to employees, or third persons, resulting from the negligence of an independent contractor.