## Interstate Coal Co. v. Baxavenie.

(Decided June 10, 1911.)

Appeal from Knox Circuit Court.

1. Mines—Application of Statute—The statute imposing certain
duties upon the owner, agent, lessee, etc., of mines, applies where
there are eight or ten men working i n the mine in the daytime,
and a like number at night, and the main entry has been worked
for a distance of 350 feet and two side entries for a distance of
about 220 feet, notwithstanding the fact that no coal is being
mined and marketed.

2. Owner—Liability—The owner and operator of a mine can not
relieve himself of the duties imposed by statute for the protec-
tion of human life, by contracting the work at so much per yard
to parties who hire, pay and discharge their own employes.

BLACK, BLACK, GOLDEN & BLACK and HIRAM H. OWENS
for appellant.

J. M. ROBISON for appellee.

OPINION OF THE COURT BY WILLIAM ROGERS CLAY,
COMMISSIONER—Affirming.

In this action for damages for personal injuries,
brought by appellee, Nick Baxavenie, against the ap-
pellant, Interstate Coal Company, the jury returned a

verdict in appellee's favor for $1,000. From the judgment based thereon, this appeal is prosecuted.

Appellant owns a boundary of coal land in Knox County, Kentucky. In this land several openings had been made for the purpose of mining coal. From some of these openings coal was being shipped to the market. Appellee was injured in the Potato Patch opening, which was some distance from the nearest opening from which coal was being mined and shipped. At the time of the accident the main entry and main airway of this opening had been driven about 350 feet, and the first and second right entries, the former being an airway, had been driven about 220 feet. The distance from the main airway to the first break-through, from the first right entry to the airway in which appellee was working at the time he was injured, was between 100 and 130 feet. The distance from the first break-through to the second break-through was about 65 feet, while the distance from the second break-through to the point where appellee was injured was about 60 feet. George Soliotis had charge of the main entry and main air course, and had several employes working under him. C. M. Addington was engaged in extending the second right entry. Lloyd McCloud, with his men, was engaged in extending the first right entry. These men in charge of the work were under contract to do the work at so much per lineal yard. They engaged, paid and discharged their own enployes. There were eight or ten men engaged in the work during the day, and a like number at night.

The accident occurred on February 6, 1909. Appellee and his "buddy," Nick Ksirihis, were engaged in shooting coal in the first right entry. On the day of the accident appellee and Ksirihis placed two shots of dynamite in the coal. These shots were prepared in the usual manner. After preparing the shots they went to the break-through in the second right entry and hid themselves. While there they heard the shots explode. There was a rumbling sound, and then the flame came through and appellee's hair and clothing caught fire. Appellee started to run. He went into a place where there was water, and two men found him there burning and threw water on him. It seemed as if the whole mine was on fire. Appellee was badly burned and suffered a great deal. He remained in the hospital for five months,

and after that two months in his room. Since the accident he has been able to do only light work.

. According to appellee's evidence, the air in the mine was very foul, and the gas so noxious that he and his fellow-employes were often made dizzy and sick, and were unable to work. When the explosion took place, the flame ran along the top of the entries. The break-throughs were not properly bratticed. Instead of being air-tight and being made of proper cloth, they looked as if they were made of old coffee sacks which did not extend to the ground, and were split in the middle. In two of the break-throughs there were no brattices whatever. There is also evidence to the effect that some of the break-throughs were from 70 to 120 feet apart. The mine was dry, and coal dust was very thick. The furnace used was not sufficient for purposes of ventilation. When the shots were fired, about a carload and a half of coal and debris was thrown down. Appellee was not injured because of a blow-out shot which goes in a straight direction, and will not turn and go in a different direction.

The evidence for appellant was to the effect that the air in the mine was pure, and that it was practically free from dust. The break-throughs were bratticed with good brattice cloth which was sufficient for the purpose. The furnace for ventilating purposes was sufficient to produce an abundant amount of air. On examination of the place where the two shots were fired, shortly after the explosion, it was found that only about half a wheelbarrow of coal was thrown down. This would tend to show that the shots were not properly fired, but were blow-out shots. There was also some evidence to the effect that sticks of dynamite had been placed near the furnace and the explosion might have been caused in this way.

Appellee's right of action is based on section 2731, of the Kentucky Statutes, which is as follows:

"The owner, agent or lessee of every coal mine, whether slope, shaft or drift, to which this act applies, shall provide and maintain for every such mine an amount of ventilation of not less than one hundred cubic feet of air per minute per person employed in such mine, which shall be circulated and distributed throughout the mine in such a manner as to dilute, render harmless,

and expel the poisonous and noxious gases from each and every working place in the mine; and no working place shall be driven more than sixty feet in advance of a break-through or air-way; and all break-throughs or air-ways, except those last made near the working face of the mine, shall be closed up and made air-tight by brattice, trap-doors or otherwise, so that the currents of air in circulation in the mine may sweep to the interior of the excavations where the persons employed in the mines are at work; and all mines governed by this statute shall be provided with artificial means of producing ventilation, such as suction or forcing fans, exhaust steam, furnaces, or other contrivances, of such capacity and power as to produce and maintain an abundant supply of air. All mines generating fire-damp shall be kept free from standing gas, and every working place shall be carefully examined every morning with a safety lamp, by a competent person or persons, before any of the workmen are allowed to enter the mine. And at every mine operated by a shaft there shall be provided an approved safety-catch, and a sufficient cover overhead, on all cages used for lowering and hoisting persons, and at the top of every shaft a safety gate shall be provided, and an adequate brake shall be attached to every drum or machine used in lowering or raising persons in all shafts and slopes.''

It is manifest from the foregoing statement of facts that there was sufficient evidence not only to take the case to the jury but to sustain its verdict, provided the statute applies to the facts of this case.

For appellant it is insisted that the Potato Patch opening was simply a development operation, and that the sole purpose of this opening was to make a connection with one of its mines so as to have an underground haul-way through which to haul coal from the old mine; that, as none of the material that was being taken out of the Potato Patch opening was being sold or marketed, but was merely being dumped upon the ground at the mouth of the opening, the opening in question was in no sense a mine; and that, therefore, the statute has no application. In our opinion, however, the question does not turn on whether or not the coal was being marketed or shipped from the opening. The question depends upon the number of men employed and the extent

of the operations. Only those mines in which not more than five persons are employed at one time are exempt from the provisions of the law. (Kentucky Statutes, section 2733.) While it is not possible, with any reasonable degree of certainty, to define a mine within the meaning of the law, we conclude that, where the operations are extended as far as they were in the case before us, there can be no question that the opening is a mine within the contemplation of the statute. The statute was designed for the protection of human life, and will not be restricted in its application to those cases only where the miners are actually engaged in mining coal which is being marketed and sold.

Appellant earnestly contends that, because appellee and those working with him were not employed by appellant, but were engaged by McCloud, who had contracted with appellant to do the work at so much per yard and who paid and discharged the men under him, and that under the contract McCloud and the other contractors were to brattice and look after the furnace, appellant was, therefore, under no legal duty to comply with the statute so far as such employes were concerned. It is admitted, however, that appellant was the owner of the mine and had control over it. The statute makes it the legal duty of such owner to comply with its terms. That being true, the owner can not shift the responsibility imposed by the statute, by resorting to any such contract as that disclosed by the record. If such were the law, the whole purpose of the statute would be defeated. Instead of placing the liability upon the parties having the power and means to safeguard the life of the miner, the burden would rest upon irresponsible parties whose negligence would leave the miner without adequate means of redress. Edwards' Admr. v. Lam, 132 Ky., 32; Curvin v. Grimes, Ib. 555.)

In Instruction No. 1 the court set out the statute and authorized a recovery by appellee in the event the jury believed from the evidence that appellant failed to perform any one of the duties imposed by the statute, and that appellee, by reason of, and as the natural and proximate result of such failure, was burned and injured.

Instruction No. 2 is as follows:

"If the explosion mentioned in the evidence herein, if you shall believe from the evidence that there was

an explosion, was caused solely by the negligent manner in which plaintiff, and the person or persons working with him, or either of them in said mine, prepared or fired the shot or shots on the said occasion, the jury should find for the defendant; but in this connection, the court says to the jury that although you may believe from the evidence that the plaintiff and the person or persons working with him in said mine, or either of them were careless or negligent in the preparation or firing said shot or shots; yet if you should further believe from the evidence, that the defendant company failed to perform any of the duties set out in instruction No. 1 and that the said explosion would not have occurred but for the said negligence of defendant as set out in instruction No. 1 herein, then, in that event, the defendant is responsible and you will so find for the plaintiff.''

By instruction No. 3 the court told the jury that, unless they believed from the evidence that appellant failed to perform the duties or any of them, set out in instruction No. 1, and that by reason thereof and as the natural result of such failure the explosion occurred, the jury should find for the defendant; or, if they believed from the evidence that appellee, or some one working with him, fired off and discharged a shot or shots of dynamite in such a manner that appellee was burned and injured by the fire from said shot, and not from the result of an explosion, they should also find for the defendant.

By instruction No. 4 the jury were told that, if they believed the injuries received by appellee, if any, were caused by the unnecessary and unusual overcharge of dynamite used in the course of mining by appellee or those working in connection with him, or was the result of an explosion of dynamite carelessly left in the entries of the mine by appellee or the other miners, and exploded by the firing of the shots in the coal, in the natural and ordinary manner of ordinarily skillful and prudent miners, and not the proximate result of dangerous and inflammable gases or other inflammable substances which had been permitted and allowed to accumulate and combine in the mine by appellant, they should find for the defendant.

Particular complaint is made of Instruction No. 2. In giving this instruction the trial court seems to have concluded that it was authorized by the opinion of this court in Edwards' Admr. v. Lam, supra. In that case, however, Edwards had nothing to do with the firing of the shots. The defense was that the explosion was caused by the negligent manner in which the other miners fired their shots, and, under the facts of that case this court directed to be given an instruction similar to the instruction complained of, but limited it to the negligence of the other miners. In the case before us, appellee and his "buddy" were engaged in firing shots. Appellee was present and had charge of the work. If there was any negligence, it was his negligence. We, therefore, conclude that, in lieu of instruction No. 3, the court should have given the usual instruction on contributory negligence. However, in view of the fact that the weight of the evidence in this case is to the effect that the explosion was caused by appellant's failure to comply with the statute, rather than the negligent manner in which the shots were fired, we conclude that the giving of the instruction complained of was not prejudicial error, when considered in connection with the other instructions which presented to the jury every theory of appellant's defense.

Judgment affirmed.