## DEEP VEIN COAL CO. ET AL. *v.* RAINEY, ADMINISTRATOR.

[No. 8,918.    Filed April 19, 1916.    Rehearing denied June 29, 1916.]

1. MASTER AND SERVANT.—*Duty of Mine Operator.—Statute.— Operator.—Who is.*—Where the owner leases a coal mine to another, he is not liable for an injury to lessee's employe alleged to be due to a violation of the statutes (§8569 et seq. Burns 1914, Acts 1905 p. 65, as amended by Acts 1911, p. 626) touching upon the duties of coal mine operators and defining who shall be regarded as such, where it affirmatively appears from the complaint, predicating the lessor's liability on the theory that he is embraced within the meaning of the term operator, that the lessee operates the mine on his own account, since only those who come within the statute (§8569 Burns 1914, *supra*) as operators are persons or companies actively and directly engaged in operating a mine or persons on whose account a mine is operated.    p. 616.

2. MASTER AND SERVANT.—*Safe Place to Work.—Delegation of Duty.*—The duty resting upon the master, whether obligated by statute or the common law, to provide a safe working place for his servants cannot be delegated to another and the master thereby escape responsibility for results.    p. 617.

3. MASTER AND SERVANT.—*Safe Place to Work.—Duty of Mine Owner.—Statute.*—The various duties of mine operators, as specified by the statutes (§8569 et seq. Burns 1914, Acts 1905, as amended by Acts 1911 p. 626) looking to the safety of employes, rest upon the actual operator and not the owner, where the latter leases his mine and retains no control over it or where it is not operated on his account.    p. 617.

4. MASTER AND SERVANT.—*Injuries to Employe.—Pleading.*—In an action for injury to a coal mine employe directed against the owner of the mine and the lessee thereof, a complaint based on the theory that the lessee was working the mine is insufficient, in the absence of proper averments, to present the issue that the owner was in fact the operator and that the lease was, merely a subterfuge to relieve the owner from liability for the negligent and unlawful operation of the mine by the lessee.    p. 618.

5. MASTER AND SERVANT.—*Injuries to Third Persons.—Liability.— Independent Contractor.—Dangerous Industry.—Statute.*—As a general rule the employer is not answerable for the acts of an independent contractor, but, where the work to be done is inherently dangerous, although care be used, or where the necessary consequence of the work is injury to another, such rule has no application; and, while the statute (§8624a Burns 1914, Acts 1911 p. 658) declares coal mining to be a dangerous industry, yet the law recognizes that it may be prosecuted with reasonable safety if care be used.    p. 619.

6. MASTER AND SERVANT.—*Operation of Mine.—Personal Injuries.—Liability of Lessor.*—In an action for injury to a coal mine employe directed against the owner of the mine and his lessee, the complaint fails to charge the owner with liability where it appears from the averments that the owner surrendered, under the terms of a lease, possession of the mine and complete control of its operation to the lessee, and that the defective condition alleged to have caused the injury complained of originated, because of the lessee's negligence, subsequent to the time the mine was placed in his control.   p. 620.

7. MASTER AND SERVANT.—*Safe Place to Work.—Inspection of Roof of Mine Room.—Statute.*—The duty imposed by the statute (§8580 Burns 1914, Acts 1905 p. 72) on a mine operator of making a reasonable inspection of the working places in a mine at least every alternate day is not discharged by a mere visual inspection of the roof of a mine room where such an inspection is insufficient and ineffective because of the nature of the material forming such roof, and the operator is chargeable with whatever knowledge of conditions a reasonable inspection would disclose.   p. 624.

8. MASTER AND SERVANT.—*Safe Place to Work.—Duty of Mine Operator.—Statute.*—Under §8580 Burns 1914, Acts 1905 p. 72, an operator of a mine is charged with the duty of keeping a sufficient quantity of timbers on hand with which to make secure the loose rock and coal discovered in the roof of a mine room or else he must remove the same.   p. 625.

9. MASTER AND SERVANT.—*Injuries to Servant.—Negligence.—Verdict.—Evidence.—Sufficiency of.*—In an action for the injury and death of a coal mine employe where there was evidence that the decedent at the time of his injury was engaged in a proper exercise of his employment, when a section of rock fell upon him from a mine room roof that had been weakened by the removal of braces and props used to give it support; that a reasonable and proper inspection would have disclosed the dangerous condition which could have been remedied by the use of supports or by the removal of the loosened rock; that when workmen notified the mine boss of the dangerous condition of the roof he failed either to support it, although it was practicable to have done so, because of a lack of proper timbers, or to remove the coal and rock that had become loosened, such evidence is sufficient to support a general verdict for the plaintiff against the lessee who had entire control and direction of the operation of the mine.   p. 625.

10. TRIAL.—*Instructions.—Repetition.*—It is proper for the trial court to refuse to give tendered instructions when, to the extent that they are correct and applicable to the issues, they are included in substance in those given.   p. 625.

11. MASTER AND SERVANT.—*Operation of Mine.—Competent Mine Boss.*—It cannot be said as a matter of law that an experienced

coal miner employed as a mine boss and holding a certificate of service and competency as such, as provided for by §§8591, 8592 Burns 1914, Acts 1905 pp. 78, 79, is a competent mine boss. p. 626.

12. MASTER AND SERVANT.—*Operation of Mine.—Examination by Mine Boss.—Statute Construed.*—It cannot be said, as a matter of law, that a visit to, and an examination of, the working places of a coal mine by a mine boss every other day will, regardless of the circumstances or the dangers to be anticipated, satisfy the statute (§8580 Burns 1914, Acts 1905 pp. 72, 73) requiring such a visit and examination at least each alternate day, since, under a proper construction of the statute, it is the duty of the mine boss to make the visits and examinations as often as the situation reasonably demands, but under no circumstances with less frequency than the statute requires. p. 626.

13. TRIAL.—*Deliberation of Jury.—Consideration of Interrogatories.*— The jury may properly consider the interrogatories either before or after the general verdict has been agreed on, or during the deliberations respecting the same, as the jury itself may determine. p. 628.

14. APPEAL.—*Refusal of Instruction.—Harmless Error.*—In an action against the lessee of a coal mine for the death of an employe, the error, if any, of the trial court in refusing to give an instruction that the jury might consider the interrogatories either before or after they had agreed on the general verdict was harmless, where the interrogatories called for facts concerning but a single branch of the case and the answers were substantially in harmony with the facts as claimed by the defendant. p. 628.

From Gibson Circuit Court; *Simon L. Vandeveer,* Judge.

Action by William H. Rainey, administrator, against the Deep Vein Coal Company and the Princeton Coal Company. From a judgment for plaintiff, the defendants appeal. *Reversed,* as to Deep Vein Coal Company. *Affirmed,* as to Princeton Coal Company.

*Lucius C. Embree* and *Morton C. Embree,* for appellants.

*William H. Rainey* and *Harvey · Harmon,* for appellee.

CALDWELL, J.—The averments of appellee's complaint are in substance as follows: That each

appellant is a corporation organized under the laws of Indiana for the purpose of mining coal; that, on February 27, 1913, appellant Deep Vein Coal Company was the owner of a coal mine in Gibson County, which prior thereto it, as such owner, had leased to appellant Princeton Coal Company for the purpose of having the latter operate it; that the latter, as lessee, on said day was, and for more than sixty days prior thereto had been, engaged in operating the mine with the full knowledge and consent of the former, and in so doing the latter employed and used more than ten men, towit, more than 200 men; that in the process of operating the mine entries were driven into the coal, from which entries rooms were turned off, among them being room No. 1, off of a designated entry, in which room there was a traveled way; that on said day, appellee's decedent, John Boger, was, and for more than sixty days prior thereto had been, in the employ of the Princeton Coal Company as a miner, and that on said day pursuant to the directions of the Princeton Coal Company he was and for two days prior thereto, had been, working in said room; that, during all the time decedent was working in said room, it was the duty of appellant Princeton Coal Company to use ordinary care to keep the room and the roof of the traveled way in a reasonably safe condition; that said appellant negligently omitted to perform such duty, and carelessly and negligently permitted the roof of the room to become unsafe, and with full knowledge of the condition of the roof and room, negligently failed to take down and remove therefrom certain loose slate and rock, and with such full knowledge of the condition of the roof over the traveled way said appellant on said day negligently directed the decedent to enter said room for

the purpose of mining coal; that decedent had no knowledge of the unsafe condition of the room, and thereupon, in obedience to the said orders of appellant Princeton Coal Company, and believing the room to be safe, he entered the room and proceeded along the traveled way towards his place of work, whereupon, after he had proceeded along said traveled way a distance of ten feet, large quantities of slate and rock fell from the roof on him and so injured him that as a consequence he died March 23, 1913, leaving surviving him, his widow, who was dependent upon him for support.

A trial resulted in a verdict against both appellants in the sum of $1,350, on which judgment was rendered. Appellant the Deep Vein Coal Company has assigned as error the overruling, first, of its demurrer to the complaint; second, of its motion for judgment on the answers to interrogatories; and, third, of its motion for a new trial.

In order that the complaint may be held to state a cause of action against either appellant, it must appear therefrom that such appellant owed the decedent the duty to exercise reasonable care for his safety; that it failed to perform such duty, and that such failure resulted proximately in the infliction of the fatal injuries suffered by decedent. If the complaint discloses that appellant, the Deep Vein Coal Company owed decedent such a duty, that fact must be gathered from the allegations that said appellant was the owner of the mine; that it had leased it to its coappellant to be operated; and that the latter as lessee was operating it with the knowledge and consent of the former. Appellee argues that, by virtue of certain provisions of the Act of 1905 and amendments thereto made in 1911 (Acts 1905 p. 65; Acts 1911 p. 626; §8569, *et seq.* Burns 1914), such a duty on the part of the

Deep Vein Coal Company existed. Our attention has been called to no decision construing that act or a similar act of any other jurisdiction, in its relation to the question presented here, and we know of no such decision. We are, therefore, required to construe the act. Section 11, §8579 Burns 1914, requires that the operator of any coal mine in this state shall employ a competent mine boss, who shall be an experienced coal miner. Section 12, §8580 Burns 1914, provides in substance, among other things, that the mine boss shall visit and examine all working places in the mine when miners are working at least every alternate day and that such places be made safe and secure; and that, upon acquiring knowledge from his own inspection or other sources of the existence of loose coal, slate, or stone in the roof over the traveled ways used by miners in going to or from their places of work, he shall remove the same or cause it to be made secure by the use of timbers, a sufficient supply of which he is required to keep at hand for such purpose.

Appellee contends that the various duties specified by §12, *supra*, rested upon appellant Deep Vein Coal Company, by virtue of its being the owner of the mine, although it had leased it to its coappellant, and was not directly engaged in operating it. Appellee bases such contention on the provisions of §1 of the act (*supra*, §8569 Burns 1914), which, so far as material here, is as follows: "The term 'operator,' as used in this act, is hereby defined to mean any corporation, company, firm, person, proprietor, lessee, owner or occupier of any coal mine in this state, or any person upon whose account the mine is operated." An inspection of the various sections of the act discloses that the term "operator" occurs a number

of times therein. The duties of an operator are outlined with great particularity. These duties involve the details of working the mine. Thus, he is required to make or cause to be made from time to time progressive maps of mine extensions (§2, §8560 Burns 1914); to construct outlets and air and escape shafts as the work advances (§3, §8571 Burns 1914); to provide a specifically described cage with certain safety appliances to be used in lowering miners to the works and in hoisting them therefrom (§4, §8572 Burns 1914); to protect the openings of the mine, provide lamps and keep them lighted when the men are working, to install speaking tubes from the surface to the various compartments and to formulate a code of signals (§7, §8575 Burns 1914); to furnish accurate scales for weighing coal and to keep United States standard weights by which the scales must be tested each morning. There are specific directions to the operator respecting the weighing of the coal, with a provision that any dispute between him and the check weighman representing the miners, as to the accuracy of the scales shall be referred to the inspector of mines (§9, §8577 Burns 1914). The operator is prohibited from placing in charge of the hoisting engine any other than experienced, competent, and sober engineers (§10, §8578 Burns 1914), and is required to adjust the system of ventilation to the changing conditions of the mine and the varying numbers of workmen employed and animals used (§11, §8579 Burns 1914). These and other provisions of the act make it entirely clear that the term "operator", as used therein, has reference to the person, firm, or corporation actively and directly engaged in operating the mine.

An analysis of §1 leads to a like conclusion.

It would seem, as a matter of course, that it was not the legislative intent to declare that the term "operator" as used in the act means "any corporation, company, firm, person," etc., broadly stated and regardless of whether such corporation, etc., bears any relation to the mine. The evident legislative intent was that the term "operator", as used in the act, should be construed to mean and include only a corporation, company, firm, or person "upon whose account the mine is operated." It would be an absurdity to presume that the legislature intended or attempted by §1 to place upon a corporation having no interest in the mine the duties and liabilities of an operator under the act. The other terms used in the section, as "proprietor, lessee, owner, occupier," are so connected with those first quoted, as "corporation", etc., that if the clause, "upon whose account the mine is operated," limits the latter it must follow that it limits the former also. That is, it is only an owner or a lessee "upon whose account the mine is operated" that comes within the meaning of the term "operator" as used in the act. The section, by the use of the word "lessee", contemplates that the owner may lease a mine to another. If he may lease it, he may place the lessee in possession, with full power to operate on his own account and for his own profit, on compliance with the terms of the lease, as by the payment of rent or royalty, etc. That is, the section recognizes that the owner may by a valid contract deprive himself of the power to direct the workings of the mine, and yet, if the section is construed as appellee contends, the law would hold him responsible for results completely beyond his control and so beyond his control only for the reason that he acted pursuant to authority conferred by law. In such case,

the owner would be held responsible for the conduct of another person, where, although he has proceeded lawfully, he is powerless to direct or control such conduct. We have already developed from a consideration of the act in general that the term "operator" as used therein has reference to the person who is actively and directly engaged in operating the mine. If the mine owner was so engaged, then under the terms of the first section the duties and liabilities of an operator under the act rest upon him. If he has leased the mine and the lessee is operating it under the lease for his own profit, then he is the sole person chargeable under the act, where the owner has reserved no power of control.

It appears from the complaint that the Deep Vein Coal Company had leased the mine to the Princeton Coal Company, and that at the time of the occurrence complained of the latter was operating the mine as lessee, and to that end that it employed the miners, including decedent, engaged in working the mine, and that it directed them in their work. In the absence of allegations to the contrary, it will be presumed that it paid the employes and the other expenses of operating the mine, and that it sold the product on its own account. Such presumptions flow legitimately from the allegations that it was operating the mine as lessee, and that it employed and directed the labor. Under such circumstances it does not appear from the complaint that the Deep Vein Coal Company was operating the mine or that it was being operated on account of such company. In fact, it affirmatively appears from the complaint that the Princeton Coal Company was operating the mine on its own account. It follows that the complaint, as predicated on the

theory that the Deep Vein Coal Company by the averments is brought within the meaning of the term "operator" as used in the act, fails to state a cause of action against such appellant.

Appellee argues that the statutory duty resting upon the Deep Vein Coal Company as owner to keep the mine in a reasonably safe condition was nondelegable; that performance thereof could not be committed by it to a lessee to its own exculpation. Appellee cites *Interstate Coal Co.* v. *Baxavenie* (1911), 144 Ky. 172, 137 S. W. 859; *Curvin* v. *Grimes* (1909), 116 S. W. 725; and *Fell* v. *Rich Hill, etc., Co.* (1886), 23 Mo. App. 216. It is true that those duties, whether of statutory or

2. common-law origin, which rest upon a master relative to making safe the place where the servant is required to work, can not be delegated for performance to another, the master thereby escaping responsibility for results. *Brazil, etc., Coal Co.* v. *Young* (1889), 117 Ind. 520, 20 N. E. 423. The infirmity in appellee's argument, however, consists in the misapplication of the principle. The various duties specified by the statute here rest on the operator rather than on the owner.

3. The owner is the operator only where he retains control of the mine, or to the extent that he retains control of it, or where it is being operated on his account. The first two cases cited by appellee were decided under a statute requiring that "the owner, agent or lessee" of any coal mine to which the statute is applicable shall ventilate it in a specified manner. In each of said cases a miner who was an employe of an independent contractor suffered an injury by reason of defective ventilation. In the Interstate case, the owner had parceled out to independent contractors the respective compartments of the mine to be operated

at a specified price per ton for the coal produced, such contractors agreeing to look after the ventilating equipment. It was held under the facts of that case that the owner retained general control of the mine, and hence that he was liable. In the Curvin case a certain section of the mine was let to an independent contractor to be operated, the other parts of it being worked under the personal direction of the owner, who assumed all duties respecting ventilation. The owner was held liable on the theory that the mine was being operated as an entirety and that the owner was in fact operating it. In the Fell case, decided under a somewhat similar statute, an employe of an independent contractor was injured by reason of the use of certain defective machinery and its negligent operation. In a suit against the mine owner to recover for such injury, he was held liable; the basis of such liability being that by the terms of the contract, under which the independent contractor was operating, the mine owner obligated himself to furnish and operate such machinery. It is apparent that these cases are distinguishable from the case at bar. Here there is no averment that the Deep Vein Coal Company was operating the mine in whole or in part, or that it directed or conducted, or reserved the power or assumed an obligation to direct or conduct, such operations in whole or in part.

It is argued also that the leasing of the mine to the Princeton Coal Company was a mere subterfuge resorted to in an attempt to safeguard the Deep Vein Coal Company from consequences likely to flow from negligent operation, and that in fact the latter company was the operator. If such a situation existed, and the Deep Vein Coal Company was in fact the operator, the com-

plaint, by proper averments, should have disclosed the fact. See *Nelson* v. *American Cement, etc., Co.* (1911), 84 Kan. 797, 115 Pac. 578; *Pottorff* v. *Fidelity Coal Min. Co.* (1912), 86 Kan. 774, 122 Pac. 120. Appellee sued on the theory that the Princeton company as lessee was working the mine.

There is a suggestion also that the Deep Vein Coal Company, independent of statute, and if its situation be measured by those common-law principles which control where the relation of contractee and independent contractor or that of landlord and tenant exists, may be held liable in this action. As a general rule, the contractee is not answerable for the acts of an independent contractor. To such rule there are exceptions, among others, where the work committed to the contractor to be done is inherently dangerous although care be used, or where the necessary consequence of doing the work as specified in the contract is injury to another. *Julius Keller Constr. Co.* v. *Herkless* (1915), 59 Ind. App. 472, 109 N. E. 797, and cases; *Louisville, etc., Co.* v. *Hughes* (1909), 134 Ga. 75, 67 S. E. 542; *Embler* v. *Gloucester Lumber Co.* (1914), 167 N. C. 457, 83 S. E. 740; *Carson* v. *Blodgett* (1915), 189 Mo. App. 120, 174 S. W. 447. While the business of mining coal is declared by statute to be a dangerous industry (§8624a Burns 1914, Acts 1911 p. 658), yet the law recognizes it as a business proper to be regulated rather than that it should be prohibited, and that it may be prosecuted with reasonable safety if care be used. *Laffery* v. *United States, etc., Co.* (1910), 83 Kan. 349, 111 Pac. 498, 45 L. R. A. (N. S.) 930, Ann. Cas. 1912A 590.

From the averments of the complaint it would seem that the relation existing between appellants

was in the nature of that of landlord and tenant, rather than that of contractee and independent contractor. In a case somewhat similar to the case at bar, the Supreme Court of Michigan, speaking by Justice Cooley, used the following language respecting each of these relations: "The owner may rent a mine, resigning all charge and control over it, and at the same time put off all responsibility for what may occur in it afterwards. If he transfers no nuisance with it, and provides for nothing by his lease which will expose others to danger, he will from that time have no more concern with the consequences to others than any third person. If instead of leasing he puts contractors in possession the result must be the same if there is nothing in the contract which is calculated to bring about danger. But if, on the other hand, he retains charge and control, and gives workmen a right to understand that he is caring for their safety and that they may rely upon him to guard against negligent conduct in the contractors and others, his moral accountability for their safety is as broad as it would be if he were working the mine in person; and his legal accountability ought to be commensurate with it." *Samuelson* v. *Cleveland, etc., Co.* (1882), 49 Mich. 164, 13 N. W. 499, 43 Am. Rep. 456. See, also, *Smith* v. *Belshaw* (1891), 89 Cal. 427, 26 Pac. 834.

There is no allegation here that the dangerous condition of which complaint is made existed at the time the lease was executed and the Princeton Company was placed in possession, or that 6. such dangerous condition would result in the operation of the mine, although due care were used. In short, it sufficiently appears from the complaint that the Deep Vein Coal Company surrendered possession of the mine to the Princeton

Coal Company, retaining no control thereof, and in addition, there is a direct averment that the defective condition orginated subsequently by reason of the negligence of the latter company in operating it. In fact the complaint contains no charge of negligence as against the former company. We are therefore required to hold that the complaint does not state a cause of action against the latter company on any theory, and that the court erred in overruling the demurrer thereto. *Deller* v. *Hofferberth* (1891), 127 Ind. 414, 26 N. E. 889; *Keeler* v. *Lederer, etc., Cor.* (1904), 26 R. I. 524, 59 Atl. 855; *Board, etc.,* v. *Woodcliffe, etc., Co.* (1907), 74 N. J. Law 355, 65 Atl. 844; *Griffin* v. *Jackson, etc., Co.* (1901), 92 Am. St. 496, full note; *City* v. *Spaulding* (1849), 50 Am. Dec. 775, note; *Brady* v. *Klein* (1903), 133 Mich. 422, 95 N. W. 557, 62 L. R. A. 909, 103 Am. St. 455, 2 Ann. Cas. 464.

Without particularizing, it should be said also that the erroneous view entertained by the trial court respecting the sufficiency of the complaint against the Deep Vein Coal Company, manifested by the ruling on the demurrer thereto, extended also to a number of instructions given and refused in their relation to that company. Thus, for reasons indicated, the court erred as against said company in giving and in refusing certain instructions, especially Nos. 8 and 13, given at the request of appellee, and Nos. 2 and 7, given on the court's own motion, and in refusing Nos. 3, 4, 7, 10 and 12, requested by appellant. The court, however, did not err in overruling the motion of the Deep Vein Coal Company for judgment on the facts returned by the jury in answer to interrogatories, since, by such answers, it is disclosed that that company, through certain of its officers and agents,

participated in the operation of the mine.    Other questions presented by the Deep Vein Coal Company, including the court's action in giving and refusing instructions, not specifically mentioned above, are not considered or decided.

Of the errors assigned by the Princeton Coal Company, all are waived, except that based on the overruling of its motion for a new trial.    In support of such assignment, appellant Princeton Coal Company insists that the evidence is insufficient to sustain the verdict.    Briefly stated, the evidence necessary to a consideration of the points made respecting its sufficiency was to the following effect:    Appellant's decedent as an employe of said appellant was engaged in mining coal in a certain subterranean room, extending north and south, and turned off from a certain branch entry.    Into this room a car track extended to near the face of the rear wall marking the limit to which the removal of coal had been accomplished in that direction.    This track originally consisted of a single line, but shortly before the occurrence complained of, said appellant had laid an additional track paralleling the original track on the west and a few feet from it.    On these tracks, cars were operated by hand power from the neck, or the passage leading to the room, to the face, for the purpose of transporting coal as it was mined.    The tracks were designed to be used and were used by miners as walkways in passing to and from their work.    There was evidence that in laying the additional track certain props placed to sustain the roof of the mine were removed, and that they were not replaced.    It was a part of decedent's duties to push cars from the neck to the face, load them with coal as it was mined and return them to the neck. On February 27, 1913, while pushing a car toward

the face, a piece of slate, four feet by six feet, and estimated to weigh about a ton, fell from the roof on him inflicting injuries from which he subsequently died.

The only points made respecting the sufficiency of the evidence are that it was not shown that the loose condition of the roof was discoverable prior to the accident, or that said appellant had any notice thereof. Appellant, by urging only these points, impliedly admits that the condition existed, and that the evidence in all other respects not questioned is sufficient. Respecting the points made, there was evidence that the props referred to above were removed from near the section of rock that subsequently fell upon the decedent, and some evidence that in the fall a thin end of the section severed itself from the main body and did not strike decedent or rest upon him, and that one prop removed had stood under such thin end. Although it be conceded that none of the props removed stood directly under the rock which fell, and that they therefore did not directly support it, it is a fact established by natural law as a practical proposition that the sustaining force of a prop, when taken in conjunction with the cohesion of the rock, extends in each direction beyond the portion of the rock immediately supported, and that there will be no tendency of any portion of such rock to sever itself and fall until a point is reached remote from a prop, where the weight of the rock overcomes such extended sustaining force to the destruction of its own cohesion. If one of the props stood immediately under the section that fell, its removal deprived such section of direct support. In any event the removal of the props deprived the roof as a whole of support, the extended effect of which may reasonably be presumed to have extended to the section that fell. Ap-

pellant as a practical operator of a mine should be
chargeable with knowledge of these facts.   There
was evidence also that the effect of removing props
is the weakening of the roof as compared with its
condition before the props were placed.   Also
that, in those cases where a loose condition of the
roof can not be discovered by the eye alone, the
fact may be ascertained by a process of sounding
the rock, called "drumming", and that the condi-
tion here could have been so determined.   There
was evidence that the kind of rock that formed
the roof here is always treacherous, and that it is
necessary to inspect it carefully; also that this rock
could have been supported without interfering with
the mine operations; and that it could have been
safely and easily taken down.   There was evidence
also that in a room extending north and south the
roof was more likely to become loose than in rooms
extending in the opposite directions.   There was
evidence also that, after the props were removed,
decedent's fellow workman called the attention of
the mine boss to the situation and requested him to
support the roof with crossbars and props, and that
workmen came into the room thereafter for that
purpose under the direction of the mine boss, but
failed to secure the roof because they did not
have timbers of the proper size.   Appellant at
no time took any steps to ascertain the condition
of the roof otherwise than by a visual inspection.
We regard this evidence as abundantly sufficient
to establish that the condition of the roof was dis-
coverable by the exercise of reasonable diligence,
and also to charge appellant with at least con-
structive knowledge of its condition.   Under the
statute, it was the imperative duty of the
appellant, through its mine boss, to visit
this room at least every alternate day when
miners were working therein, and to make a reason-

able inspection of the roof. Such duty is not discharged by mere visual examination, where the nature of the material forming the roof is of a kind that such an inspection will not be effective. Appellant stood charged with whatever knowledge such a reasonable inspection would have brought to it. It was the duty of appellant also to remove or to secure by the use of timbers all loose

8. coal, slate, or rock discovered by such an inspection or otherwise, a sufficient quantity of which timbers it was required to keep on hand. §12, *supra*, §8580 Burns 1914; *Domestic Coal Co.* v. *DeArmey* (1913), 179 Ind. 592, 100 N. E. 675, 102 N. E. 99; *Princeton Coal, etc., Co.* v. *Downer* (1911), 48 Ind. App. 136, 93 N. E. 1009. The

9. evidence is sufficient to sustain the verdict as against the Princeton Coal Company.

Said appellant challenges the correctness of a number of instructions given, and also insists that the court erred in refusing others tendered. We should not be warranted in considering specifically each instruction respecting which complaint is made. As affecting the Princeton Coal Company the jury was instructed with substantial

10. accuracy, both as to instructions given and the refusal of others tendered. Of the latter, to the extent that they were correct and applicable they were included in substance in those given. However, in some particulars, instructions refused should be specifically considered. Thus, several instructions tendered and refused were to the effect that if the operator employed as a mine boss an experienced coal miner duly licensed under the laws of the state, and if such mine boss visited and examined the place where decedent was working either on the day of the accident and before

the happening thereof, or on either of the two days next prior thereto, for the purpose of visiting and examining such place, then that the operator thereby complied with the statute requiring that a competent mine boss who is an experienced miner be employed, and that he visit and examine the working place, etc., at least every alternate day, etc.

11. Perhaps prima facie a mine boss with the qualifications indicated may be a competent mine boss, but we do not believe it can be said as matter of law that he is such. It is possible that one with such qualifications may in fact be incompetent, or he may at one time have been competent and subsequently have become incompetent. As to the other element of the tendered charges, the statute by the use of the phrase "at least" prescribes the minimum of visits. It can not be said as matter of law that regardless of the circumstances or the danger to be anticipated,

12. a visit each alternate day will satisfy the statute. By the terms of the statute properly construed, it is the duty of the mine boss to visit and examine as frequently as the situation reasonably demands, but in any event at least every alternate day.

The court in submitting interrogatories to the jury charged, at appellant's request, that they be answered upon a consideration of the evidence in the event of a general verdict. Appellant requested also the thirty-fifth instruction, which was refused by the court. It is as follows: "The law does not prescribe when you shall consider and answer the interrogatories that will be submitted to you, and you are at liberty to take them into consideration and answer them either before or after you have agreed upon a general verdict." In *Wabash R. Co.* v. *Gretzinger* (1914), 182 Ind. 155,

104 N. E. 69, the trial court submitted interrogatories and delivered them to the jury sealed in an envelope, with instructions that the jury should not open the envelope until they had agreed on a general verdict. The Supreme Court in that case condemned such a practice, but held it to be harmless under the particular circumstances there presented. In the course of the opinion the following language is used: "While it is true that the statute does not require the interrogatories to be answered in the absence of an agreement on a general verdict, we perceive no good reason why they should not be considered by the jury in deliberating on the general verdict, for it is obvious that such consideration might better enable the jury to make a conscientious general finding." See, also, *Southern R. Co.* v. *Weidenbrenner* (1915), 61 Ind. App. 314, 109 N. E. 926. The process by which a general verdict is reached, where the jury properly performs its full function, is as follows: First, the determining of all the material facts; second, the application of the law to such facts pursuant to the court's instructions. The result so arrived at is the general verdict. It is possible that in a given case the facts may be so numerous and so complicated that the jury may be unable to keep them in mind in order that they may be marshalled into the general verdict. A proper interrogatory deals with a single question of fact, necessarily considered also in properly arriving at the general verdict. A number of such interrogatories deals with a number or all of such essential facts. It follows, as a practical proposition, that interrogatories may perform the office of suggesting to the recollection of the jury material questions of fact which otherwise might be overlooked in arriving at the general verdict. It would, therefore, seem to

be not only proper but also a commendable practice for the jury to be left freely to consider the interrogatories at such a time in the course of their deliberations as will best enable them not only to answer such interrogatories truthfully and accurately, but also to arrive at a just general verdict. Such a rule would authorize the jury to consider the interrogatories either before or after the general verdict had been agreed on, or during the deliberations respecting the same, as the jury itself should determine. It is therefore our judgment that the tendered instruction might very properly have been given to the jury. In the present case, however, it is not necessary that we determine whether the refusal of such instruction was error, for, if error, it was harmless as against the Princeton Coal Company. The other instructions given by the court to guide the jury in answering interrogatories are substantially the same as those on that subject in the Gretzinger case, *supra*. Moreover, by the interrogatories, the facts respecting but a single branch of the case are called for. The answers in the main are in harmony with what appellant claims such facts to be; that is, that the Princeton Coal Company as lessee, rather than the Deep Vein Coal Company, was operating the mine. Other facts found, tending to show that the latter was a joint tort feasor with the former, are more favorable to the Princeton Coal Company than it claims the facts to be. Under such circumstances the refusal of such instruction, if error, was harmless. We find no error in the record justifying a reversal of the case as to the Princeton Coal Company.

The judgment is therefore reversed as to the appellant Deep Vein Coal Company, with instructions to the court to sustain its motion for a new

trial, and also its demurrer to the complaint, and for other proceedings in harmony with this opinion; and is affirmed as to the appellant the Princeton Coal Company.

NOTE.—Reported in 112 N. E. 392. Liability of mine owner for negligent injury to employe of independent contractor working in mine, 45 L. R. A. (N. S.) 930. What persons deemed to be independent contractors within meaning of rule relieving employer from liability, notes 65 L. R. A. 445; 17 L. R. A. (N. S.) 371. Delegation of master's duty as to place and appliances, note 54 L. R. A. 63. See under (1) 27 Cyc 721; (6) 26 Cyc 1568.