MINNIE POTTORFF, *Appellant*, v. THE FIDELITY COAL MINING COMPANY *et al.*, *Appellees.*

No. 17,525.

SYLLABUS BY THE COURT.

1. NEGLIGENCE—*Personal Injuries* — *"Independent Contractor."* When a person lets out work to another, the contractee reserving no control over the work or workmen, the relation of contractor and contractee exists, and not that of master and servant, and the contractee is not liable for the negligent or improper execution of the work by the contractor.

2. "INDEPENDENT CONTRACTOR" DEFINED. An independent contractor generally is one who, exercising an independent employment, contracts to do a piece of work according to his own methods and without being subject to control of his employer, except as to the result of his work.

3. ———— *Employer—Employee—Liability.* An employer may make himself liable by retaining the right to direct and control the time and manner or means of executing the work, although he may inspect and supervise it to the extent necessary to produce the result intended by the contract without incurring such liability.

4. ———— *Independent Contractor.* A contract between the owner of a coal mine and another party for its operation, is examined, and it is held that this party is not an independent contractor within the rules stated in the above paragraphs.

Appeal from Cherokee district court. Opinion filed March 9, 1912. Reversed.

*Ralph S. Nelson,* and *E. H. Ware,* for the appellant.
*W. R. Cowley, Al F. Williams, W. C. Scarritt, J. Walter Farrar,* and *W. R. Thurmond,* for the appellees.

The opinion of the court was delivered by

BENSON, J.: The principal issue is between the appellant, Minnie Pottorff, and the Fidelity Coal Mining Company, appellee, and arises upon a demurrer to a reply. The determination of this issue rests upon the legal effect of a written contract between the coal mining company and Barrett. This instrument contains the following provisions:

"That said Coal Company for and in consideration of the covenants hereinafter contained, has this day demised, leased, turned over and delivered to the said Barrett, possession of all the underground for the extraction of coal, shafts, including Engines, Boilers, Hoisting Machinery, and other fixed equipment, and mines hereinafter described, and also possession of the personal property, mine supplies and mules now in and about said mines as the same are inventoried and valued in schedule hereto attached and made a part of this lease and agreement.

"The lands, coal shafts and mines hereinbefore mentioned are the property of the party of the first part and are described as follows, to-wit:    (Description of mines.)

"Together with all mine buildings, Machinery, Engines, Boilers, and other equipment, located at the aforesaid mines, respectively at the date of this agreement. . . .

"First. Said Barrett agrees to proceed with all reasonable diligence subject to the control and limitations herein contained to mine and take out all coal lying under the lands hereinbefore described which can be taken out at the mine run mining price in force in district, and with safety to the mines and miners, and to do so in a good and workmanlike manner and to deliver the said coal to the said Coal Company free on board railroad cars, at or near the mouth of said shafts.

"Second. The said Coal Company agrees to receive the coal so mined and delivered and to pay said Bar-

rett for such coal as shall be mined and produced at
the said shafts, as follows, to-wit: $1.25 per ton of
Two Thousand (2000) pounds for mine run coal. This
price is based on mine run mining price 72c per ton
and may be varied during this lease and agreement
only as the mine run mining price in the mining dis-
trict in which said mines are located, may change from
the prices in effect at the time this lease and agreement
is to be made effective. Meaning that said Barrett shall
he paid at all times 53c per ton above mine run mining
price, coal to be weighed when possible on railroad
track scales, at or near mines.

"Third. The said Barrett agrees that he will not
*sell* any of the coal to be mined by him under this agree-
ment to any person or corporation others than said
coal company and that he will confine his output to the
requirements and demands of said Coal Company.

"Fourth. Said Barrett agrees that he (and the
miners to be employed by him, so far as he can in-
fluence them), will purchase all merchandise, powder
and supplies required by them, from said Coal Com-
pany at its store in Stone City, Kansas, and the said
Coal Company agrees that it will sell all such mer-
chandise, powder and supplies at the regular retail
price, as charged in this district, and it is agreed that
said Barrett, will turn in daily to the office of the said
Coal Company at Stone City, the time and earnings of
his employes, and that said Coal Company will take
orders from said employes on said Barrett for the
amount of goods sold said employes, and said Bar-
rett hereby agrees to protect said orders and all in-
debtedness of said employes to said Coal Company, by
allowing said Coal Company to pay said employes on
each pay day and to deduct the amount of all such in-
debtedness from the earnings of said employes, and it is
further agreed that the said Coal Company, will pay off
said employes on all pay days, provided, however, that
if the money due said Barrett from said Coal Company
on any pay day is not enough to discharge the pay roll
of said Barrett, the said Coal Company shall not be
obliged to pay the said employes unless the said Bar-
rett furnishes the balance of the funds necessary
therefor.

"Fifth. The said Coal Company agrees to sell to

Pottorff v. Mining Co.

said Barrett Powder for his use in said mines at ten (10c) cents per keg over and above cost to them.

"Sixth. (Provides for semi-monthly settlements between the parties.)

"Seventh. It is agreed that the personal property, material and mine supplies hereinbefore referred to . . . are for the use and service of said Barrett without payment therefor, and at the conclusion of this lease and agreement, said Barrett to turn back to said Coal Company all of said property in as good condition as he received the same, natural wear and tear excepted.

"Eighth. (Provides that the mules or their equivalent in value as fixed in the inventory shall be returned to the company at the expiration of the agreement.)

"Ninth. (Provides that the equipment added by Barrett shall be the property of the Company to be surrendered to the Company); Except, that if said Barrett shall have purchased and added to said mines or either of them any mining machinery and mechanical haulage, he shall have the privilege of removing such mining machinery and mechanical haulage so purchased by him before surrendering possession of the premises and properties covered by this lease and agreement.

"Tenth. It is agreed that said Coal Company, by its authorized representatives shall have at all times the right to enter said mines, or either of them, for the purpose of making personal inspection and ascertaining the condition, character and progress of the work, but that it shall have or exercise no control over the miners or other employes who may be at that time at work therein.

"Eleventh. It is further mutually agreed that said Coal Company shall be under no liability, under any circumstances, for accident or injury to life, limb or property, in or about said mines, or either of them. It being understood that in event of fire from accident, said Barrett, is in no way liable to said Coal Company for loss to property caused by such fire.

"Twelfth. . . . Barrett shall not be permitted to assign or sublet this contract or any portion of his rights or privileges hereunder, to any person or persons,—firm or corporation without the written consent of said Coal Company.

"Thirteenth. . . . This lease and agreement shall continue for a term of FIVE years from the date hereof, provided that the Coal Company reserves the right to terminate this contract and any and all rights and privileges of the said Barrett hereunder, at any time during the term hereof, provided said Coal Company should wish to sell the mines, or should said Barrett's manner of working the mines not be agreeable to said Coal Company, in either event said lease and agreement can be annulled by said Coal Company,—giving said Barrett written notice to that effect it being understood that said Barrett has the privilege of operating said mines sixty continuous working days from date of such written notice. It being further agreed that in event said Coal Company stops said Barrett from working said mines within that time said Barrett's privilege is continued until such time as said company shall have given him sixty working days for loading coal.

"Fifteenth. It is agreed that the coal herein provided for, to be mined and delivered by said Barrett to said Coal Company, shall be prepared for market on the present established screen equipment at the mines aforesaid, and the said Barrett further agrees to make such sizes and kinds of coal with the present equipment as may be desired by said Coal Company. If at any time during the term of this lease, the Coal Company should desire to change any of the existing screens, it is at liberty to do so at its own expense, the said Barrett being responsible only for keeping the same in repair. It being understood and agreed that should the said Coal Company desire to abandon said mines or either of them, on or before the expiration of this lease and agreement, the said Barrett agrees to deliver the track and material below ground to the said Coal Company on the top of the ground without any cost for raising the same."

The schedule referred to contained a list of mine equipments, including rails and pit cars and mules, but did not include electrical appliances. The petition alleged that Pottorff was seated in a car in the mine, propelled by an electric motor, the train being used to convey the miners with their "jacks," or cans of powder, over a track in the "run around" from the bottom of the

shaft to their respective rooms; that when the motorman turned on the electric current to start the train, it was diverted by a coating of oil and sand upon the track from its usual course in passing from the motor to the tracks and went into and through the car and the tools and jacks of the miners, exploding the powder and killing Pottorff. The charges of negligence were the failure to furnish the miners a safe place; in allowing the track to be covered with a coating of sand and oil; in allowing miners to ride with their jacks of powder in cars exposed to currents of electricity; in placing the cars and the motor in charge of ignorant and unskilled men; and in failure to give warning of the danger—the deceased being ignorant of such dangers, which were well known to the defendants.

The alleged negligence and resulting death are facts to be taken as true—a stipulation having been entered into to the effect that if the contract constitutes no defense to the Coal Company, judgment should be entered for the plaintiff for $2500. The district court gave judgment for appellees for costs.

The principal contentions of the appellant are that upon the terms of the contract Barrett was not an independent contractor; that the contract is an engagement for the services of Barrett in the operation of the company's mine and does not relieve it of liability for negligence in such operation. The appellees rely upon the rule relieving the owner from liability for injuries where the work in the prosecution of which the injury is suffered has been let out to another. The rule as generally declared was stated in *Laffery v. Gypsum Co.*, 83 Kan. 349, 111 Pac. 498, thus:

"That when a person lets out work to another, the contractee reserving no control over the work or workmen, the relation of contractor and contractee exists, and not that of master and servant, and the contractee is not liable for the negligent or improper execution of the work by the contractor." (p. 354.)

Various exceptions to the rule were also stated in the opinion. In *Nelson v. Cement Co.*, 84 Kan. 797, 115 Pac. 578, the views expressed in the Laffery case were adhered to. It was said, however, in the latter case that courts will not hesitate to look into the substance of the contract and all the circumstances in order to determine the actual relation which the owner of the property sustains to the persons employed. In this case this relation must be determined from the language of the instrument, considered in its relation to the subject matter, viz., the operation of a coal mine.

While the agreement is in its first paragraph called a lease, it is a working agreement under which a mine is to be operated. To determine its real nature all parts must be carefully considered. It will be noticed that while the term is stated to be five years, yet it may be annulled by the company alone at any time upon written notice, after which Barrett has only the privilege of loading coal already mined for sixty days, and this merely because his manner of working the mines is not agreeable to the company. That is to say, the agreement may be annulled at the pleasure of the company, with or without default by the other party. Another feature of the agreement is that the product can be sold to no one but the company. While the reference is thus made to possible sales, the coal belongs to the company. It is not sold to the latter, but the mining is paid for at a given rate per ton. Again, Barrett is not permitted to control the production but is to confine the output to the requirements and demands of the company. That is, the owner may work the mines to their capacity, restrict production, or stop the work altogether. It appears that in connection with mining operations the company owns a store, and it is agreed that (so far as he can influence them) the employees will purchase all their merchandise, supplies, and powder at this store, at prices charged in the district; that he will turn into the company's office daily

the time and earnings of the men, and protect the company by allowing it to pay them, after deducting their indebtedness at the store. That is, the company pays the men upon pay rolls furnished by Barrett, provided only that if on any pay day there is not enough due Barrett to discharge the pay roll he will make up the deficiency. In consideration for the coal mined, the operations carried on, or for his services, according as the relations of the parties may be regarded, Barrett is to receive fifty-three cents per ton, that is, he is to have fifty-three cents per ton above the mine-run mining price, the actual amount to be determined by the schedule of prices paid the miners for the time being. If the schedule is raised he receives more—only because more is required to pay the men—but his remuneration remains the same, depending only on the quantity produced.

Various definitions have been essayed of the term "independent contractor," as used in the law of master and servant, the sense in which it must be applied here. Judge Lurton, in *Powell v. Construction Company,* 88 Tenn. 692, 13 S. W. 691, said:

"An independent contractor is one who, exercising an independent employment, contracts to do a piece of work according to his own methods and without being subject to control of his employer, except as to result of his work." (p. 697.)

While any definition might not exactly fit all possible cases the foregoing has the merit of brevity and is approved in *Humpton v. Unterkircher & Sons,* 97 Iowa, 509, 514, 66 N. W. 776, and other cases. An independent contractor represents the will of his employer only in the result of his work and not as to the means by which it is accomplished. (1 Thomp. Com. on the L. of Neg., § 622.)

"The proprietor may make himself liable by retaining the right to direct and control the time and manner of executing the work" (1 Lawson, Rights, Remedies

and Practice, § 299), although the proprietor may inspect and supervise the work to the extent necessary to produce the result intended by the contract without incurring such liability (*Uppington v. City of New York,* 165 N. Y. 222, 59 N. E. 91, 53 L. R. A: 550; *Casement v. Brown,* 148 U. S. 615; Note, 65 L. R. A. 475). The usual test is whether the owner reserves the right of direction and control of the means and method of executing the work. (Note, 76 Am. St. Rep. 382.) The will of the owner is represented in the result of the undertaking rather than in the particular methods or means by which it is to be accomplished. Cases where a limited or partial control is reserved to the employer or owner while the general control over means and methods is given to the contractor, were referred to in *Railway Co. v. Loosley,* 76 Kan. 103, 90 Pac. 990, where it was said:

"It is not essential that one who engages a contractor to produce a given result should reserve, or should interfere and take, complete or exclusive control over all features of the work to render him liable as master of the contractor's servants; but the fact that he possesses a limited or partial control will not entail such a liability if the contractor is still left free to exercise his own will generally respecting the methods and means of accomplishing the result." (Syl. ¶ 5.)

The principles governing this subject as generally applied are stated in *Roddy v. The Mo. Pac. Ry. Co.,* 104 Mo. 234, 15 S. W. 1112, 24 Am. St. Rep. 333; *Larson v. American Bridge Co.,* 40 Wash. 224, 82 Pac. 294, 111 Am. St. Rep. 904; *Blake v. Thirst,* 32 L. J. Exch., n. s., 189; Note, 22 Am. St. Rep. 459, 463; Note, 65 L. R. A. 445.

(See, also, *St. L., Ft. S. & W. Rld. Co. v. Willis, Adm'x,* 38 Kan. 330, 16 Pac. 728.)

Without further citation from the multitude of authorities on this subject it only remains to apply these principles to the contract in question. First as to time. The contractor may have the benefit of the agreement

for five years or five days, or any shorter period, at the will of the company. He must quit should "the working of the mines not be agreeable" to the company, with no further right than to load the product mined in sixty days. But this provision, so destructive of independence, is not limited in its effect to time merely, for the right to thus summarily annul the agreement necessarily carries with it the potency of compelling such means and methods as will make the conduct of the work agreeable to the company. While the contract does not state that Barrett shall observe the methods and use the means prescribed by the company or suffer forfeiture, yet the company may annul the contract at its option, if a failure to observe its directions in these matters should not be agreeable. The use of the word "agreeable" seems naturally to apply to such conduct of the work as might cause danger or bring disaster to the miners or the property. But whether such a contingency was in mind or not the sweeping reservation includes certainly the right to interpose whenever negligent methods will imperil life or property. Under the clause in question the company might have compelled the contractor to exercise proper care in the use of electrical appliances or to have ceased their use altogether by terminating the contract. In the Nelson case it was said that if the cement company had retained the right to discharge at will one of the contractors they were not independent. Here the right of annulment, equivalent to a discharge, is expressly reserved in the contract.

The contractor does not appear to be independent in other respects. The output of the mine is absolutely controlled by the company. It may operate the mines at full capacity or shut down entirely, according to its own "requirements and demands." It will also be noticed that the pay of the contractor is not contingent upon the rise or fall of wages. His remuneration is fixed and certain at a definite price per ton. Again,

the miners are to be paid by the company and their trade influenced for the company's store. These features are indicative of dependency. True, the company is not obliged to pay to the miners more than is due to the contractor, but the provision for a daily report of service affords the company the control of the situation, and practically it pays the men.

It is true that the effect of a contract is not to be determined by the phraseology of detached parts, but by the entire instrument as a connected whole, and each part as affected by every other part, yet in view of the provisions referred to and the spirit and purpose of the agreement as we interpret it in the light of the business to be operated under it, it is held that Barrett is not an independent contractor and that the contract referred to is not a defense to this action.

The appellant presents an argument for reversal on another ground, viz., that coal mining is recognized by our statutes as inherently dangerous, and therefore the owner can not be relieved from liability in a case like this, merely because the mine is operated by an independent contractor. In the view taken of the contract in question it is not deemed necessary to examine this proposition.

The judgment is reversed with directions to render judgment for the appellant against the coal company as provided in the stipulation.