**NATIONAL LABOR RELATIONS BOARD
v. BLOUNT et al.**

No. 12284.

Circuit Court of Appeals, Eighth Circuit.

Nov. 4, 1942.

Rehearing Denied Nov. 27, 1942.

586

RIDDICK, Circuit Judge, dissenting.

———◇———

Samuel Richeson, of Potosi, Mo., and Harry O. Smith, of St. Louis, Mo. (Louis H. Breuer, of Rolla, Mo., on the brief), for respondents.

Frank J. Donner, Senior Atty., National Labor Relations Board, of Washington, D. C. (Robert B. Watts, Gen. Counsel, Ernest A. Gross, Associate Gen. Counsel, Gerhard P. Van Arkel, Asst. Gen. Counsel, and Bonnell Phillips, Atty., National Labor Relations Board, all of Washington, D. C., on the brief), for petitioner.

Before GARDNER, WOODROUGH, and RIDDICK, Circuit Judges.

WOODROUGH, Circuit Judge.

This case comes before the court on petition by the National Labor Relations Board for enforcement of an order issued against respondents pursuant to Section 10(c) of the National Labor Relations Act, 49 Stat. 449, 29 U.S.C.A. § 151 et seq. The findings of fact, conclusions of law and order of the Board are reported, 37 N.L. R.B. 662, the gist of them being that:

Respondents own, as tenants in common, and operate, a tract of approximately 640 acres of land known as the Paw Paw Patch, in the vicinity of Richwoods, Washington County, Missouri. The land is managed for respondents by R. A. Blount, himself a respondent, who engages miners and haulers to extract a mineral substance known as barite or tiff from the land and to transport it to points of sale. The production of tiff from respondents' land in 1939 and 1940 approximated 3,800 tons in volume and $24,000 in value for each year. Substantially all of the tiff so produced was sold to purchasers who shipped it to points outside the State of Missouri.

The Board found that the miners who extract tiff from respondents' land, and the haulers who transport it in trucks to various selling points, are employed by, and are the employees of, respondents within the meaning of Section 2(2) and (3) of the Act, and that respondents, through their agent in the operation of their property, R. A. Blount, refused to bargain collectively with International Union of Mine, Mill and Smelter Workers, Local 113, as the exclusive representative of their employees in the appropriate bargaining unit, thereby violating Section 8(1) and (5) of the Act.

Upon the above findings, the Board ordered respondents to cease and desist

INSPECTED BY NO. 3

from their unfair labor practices, to bargain collectively, upon request, with International Union of Mine, Mill and Smelter Workers, Local 113, and to post appropriate notices.

Study of the whole record has convinced the court that the evidentiary findings of the Board include the material incidents proven and are supported by substantial ⌐ the controlling question ┊ted for our determination is whether the facts found support its conclusion that ⌐o mine tiff on respondents' e who haul it in their own ⌐ployees of the respondents endment of the Act.[1]

⌐dents contend as to the min⌐ egal nature of the relationship respondents and the miners a Missouri statute enacted in in Revised Statutes of Mis-Sections 13594–13597, Mo.R.S. ⌐4–14787. The statute requires of real estate who permits per⌐ · than his servants, agents or to enter upon his land and dig ore thererom, to keep a printed statement of the terms, conditions and requirements upon which such may be done posted conspicuously and made available to the miner, and in case the owner does not comply with the statutory requirement as to such notification, then the person who has been permitted to and does dig or open a mine on the land shall have the right to continue to work the shaft, mine, prospect or deposit of mineral so dug or opened by him for the term of three years from the date the permit was given him, subject to conditions provided in the statute. One of the conditions is that if the miner shall fail to work or cause to be worked such shaft, mine, quarry, prospect or deposit of mineral for ten days in any month, he shall forfeit all right to work unless the failure was caused by unavoidable circumstances or caused or consented to by the owner. Another condition is that the miner shall pay the owner the agreed royalty for min-

ing, and if no royalty is agreed upon, then the royalty shall be the same as is paid by other miners on the land, or if there are no others then the same as is paid by miners on lands nearest thereto. The miner having paid or tendered the royalty on ore dug by him may call upon the land owner to receive and pay for such ore at a price not exceeding the amount named in the notice [required to be posted] and if the owner refuses within five days the miner may dispose of the ore to some other person. The final section provides that all ore or mineral dug on the lands of any person in the state is the absolute property of the owner or lessee of such lands.

The respondents never complied with the statute requiring the posting of notice of the terms, conditions and requirements of mining on their property, and they contend that the statute therefore operated to establish and define a contract between them and the persons whom they permitted to mine on their land in such terms that the miners were independent contractors and not employees.

As to the haulers, respondents contend that they are employees of the miners and not of the landowners.

The Board observed in respect to the miners that the statutes relied on "specifically state that they apply only to miners other than the landowner's 'servants, agents or employees' and thus furnish no assistance in determining whether any particular miner is or is not an employee." The Board also considered and commented on the decision of the Missouri courts in Woodruff v. Superior Mineral Co., 230 Mo. App. 616, 70 S.W.2d 1104; State ex rel. Superior Mineral Co. v. Hostetter, 337 Mo. 718, 85 S.W.2d 743, and concluded from the statute and the decisions that the Missouri legislature had indicated that it considered persons such as tiff miners to be employees within the policy of the state compensation act without regard to their common law status. The Board also declared that "in determining whether the tiff miners and haulers are employees of

---

[1] Section 2(3) of the Act defines "employee" as follows:

"The term 'employee' shall include any employee, and shall not be limited to the employees of a particular employer, unless the Act [chapter] explicitly states otherwise, and shall include any individual whose work has ceased as a consequence of, or in connection with, any current labor dispute or because of any unfair labor practice, and who has not obtained any other regular and substantially equivalent employment, but shall not include any individual employed as an agricultural laborer, or in the domestic service of any family or person at his home, or any individual employed by his parent or spouse."

the respondents within the meaning of Section 2(2) and (3) of the Act, we seek to apply the policy and provisions of the Act, and in such inquiry to take into consideration but not to be rigidly bound by common-law or local statutory conceptions."

We are not persuaded that the Missouri statute concerning mining relied on by respondents, or any Missouri decisions related to it[2], contradict the Board's finding that employment relationship exists within the intendment of the federal Act between respondents and the miners who extract their ore. Woodruff v. Superior Mineral Co., 230 Mo.App. 616, 70 S.W.2d 1104, involved an appeal to the St. Louis Court of Appeals from the judgment of the Circuit Court of Washington County which reversed a workmen's compensation award in favor of a miner injured while working on the land of defendant company, a producer of tiff operating under a lease. The Commission found that Woodruff, the plaintiff, was engaged in the hand mining of tiff on the leased premises of the Superior Mineral Co., and that under Section 3308(a), R.S.Mo.1929, Mo.R.S.A. § 3698(a), the mineral company was an employer and hence liable under the Missouri Workmen's Compensation Act to the plaintiff. Section 3308(a), Mo.R.S.A. § 3698(a), provides as follows:

"Any person who has work done under contract on or about his premises which is an operation of the usual business which he there carries on shall be deemed an employer and shall be liable under this Act [chapter] to such contractor, his subcontractors, and their employees, when injured or killed on or about the premises of the employer while doing work which is in the usual course of his business."

The St. Louis Court of Appeals reinstated the award of the Commission in favor of the plaintiff and rejected the contentions of the mineral company that under Sections 13593 et seq., Mo.R.S.A. § 14783 et seq., the relationship between the defendant and the plaintiff as to the occupancy of the land and the right to mine thereon was that of licensor and licensee, and, as to the right, interest, and property in the ore or mineral dug on the land, that the relationship was that of buyer and seller of a commodity and that there was no testimony to support a finding that the plaintiff was an employee of the defendant. The court, pointing out that "the mining of the ore under the facts in the case seems to us to be a service rendered by the miner to the defendant mining company", held that the miner was engaged in the business of defendant company, which was, therefore, an employer within the meaning of the Compensation Act.

In State ex rel. Superior Mineral Co. v. Hostetter, 337 Mo. 718, 85 S.W.2d 743, the company sought review of the holding in the Woodruff case in the Supreme Court of Missouri. The Supreme Court refused to quash the opinion of the court below but in quashing its writ of certiorari it clearly recognized the liability of the company under Section 3308(a) of the Workmen's Compensation Act, Mo.R.S.A. § 3698 (a), determined by the Court of Appeals. The Supreme Court pointed out that the company was not a mere landowner but was engaged in the "usual business" of producing tiff and that the miner's functions were a part of that "usual business" and that hence liability resulted under Section 3308(a), Mo.R.S.A. § 3698(a). Its holding was that the operator of the mining property from which the ore was mined was an employer within the meaning of the Workmen's Compensation Act of Mis-

[2] Woodruff v. Superior Mineral Company, 230 Mo.App. 616, 70 S.W.2d 1104, certiorari quashed 337 Mo. 718, 85 S.W. 2d 743; Vaseleou v. St. Louis Realty & Securities Co., 344 Mo. 1121, 130 S.W.2d 538; Skidmore v. Haggard, 341 Mo. 837, 110 S.W.2d 726; Kourik v. English, 340 Mo. 367, 100 S.W.2d 901; Ross v. St. Louis Dairy Co., 339 Mo. 982, 98 S.W. 2d 717; Sargent v. Clements, 337 Mo. 1127, 88 S.W.2d 174; Maltz v. Jackoway-Katz Cap Co., 336 Mo. 1000, 82 S. W.2d 909; Rutherford v. Tobin Quarries, 336 Mo. 1171, 82 S.W.2d 918; Simmons v. Kansas City Jockey Club, 334 Mo. 99, 66 S.W.2d 119; Coul v.

George B. Peck Dry Goods Co., 326 Mo. 870, 32 S.W.2d 758; Hoelker v. American Press, 317 Mo. 64, 296 S.W. 1008; Garcia v. Vix Ice Cream Co., Mo.App., 147 S.W.2d 141; Horn v. Asphalt Products Corporation, Mo.App., 131 S.W.2d 871; Miller v. St. Louis Realty & Securities Co., Mo.App., 103 S.W.2d 510; Bernat v. Star-Chronicle Publishing Co., Mo.App., 84 S.W.2d 429; Meyer v. Adams, Mo.App., 50 S.W.2d 744; Aubuchon v. Security Construction Co., Mo. App., 291 S.W. 187; Revised Statutes of Missouri 1929, Sections 13593–13596, Sections 14783–14786, R.S.Mo.1939, Mo. R.S.A. § 14783–14786.

souri and that those who were permitted to enter upon his land pursuant to Section 13594, Mo.R.S.A. § 14784, were subject to that Act.

■ Although, as stated, the respondents rely upon the 1877 mining statute and the foregoing decisions in which employer and employee status was held to exist within the meaning of the Missouri compensation act, they insist that their relation to the miners on their land is different from that of the Superior Mineral Co., defendant in that controversy. They contend in effect that they have nothing to do with the mining on their land except as they receive their royalty in respect to the ore product and they stress the agreed fact that in the purchasing of the ore from the Paw Paw Patch, the co-owner, respondent R. A. Blount buys and sells tiff on his own account.

■ But we find no merit in the contentions. Section 13597 of the Missouri statute, Mo.R.S.A. § 14787, relied on provides that "All * * * ore * * * mined * * * upon the lands of any person * * * shall be deemed and held to be the absolute property of the owner or lessee of such lands [with certain exceptions not material here]" and any person who in any manner makes away with or conceals any such ore so as to deprive the owner thereof of the same is guilty of grand or petty larceny according to the value. It is apparent that through the labor of the miners on their land the respondents are continuously becoming the owners of ore produced by such labor, and we think the Board correctly found that the respondents are not merely landowners but that they operate their property for the purpose of obtaining a money income from the mining and sale of the tiff located there. On the other hand, the miners work on the land in the day to day process of earning a living by labor in respondents' service. There is a continuing relationship in a going enterprise. The fact that some of the respondents do not personally take part in the operations is immaterial. It is clear that R. A. Blount acts for all respondents and does whatever is necessary to carry on the business and protect his own and his co-tenants' interests. The miners are compensated in substantially the same way as are many thousands of others who work on a piece work basis throughout the country.

■ On July 15, 1939, R. A. Blount promulgated and circulated among respondents' miners and haulers, the following notice:

"Effective on and after August 15, 1939, our price on Barytes mined and hauled from property in Richwoods district will be as follows:

"Mining, $3.90 per ton (2,000)#.
"Hauling, $1.40 per ton (2,000)#.
"Please notify all miners you haul for this change.
*Clean dry ore.*
"(s) R. A. Blount,
"*Agent.*"

The rates in the notice constituted a reduction below existing rates and though the miners and haulers went on strike against the reduction they ultimately accepted the rates. The theory urged by the respondents that there is an open market for the tiff which the miners produce from the Patch and that the miners are free to sell and do sell the tiff on such markets, is not supported by the facts. On the contrary, there is substantial evidence supporting the finding of the Board that Blount arranges for the disposition of the tiff and gives the directions for the hauling to the selling points where the miners and haulers receive a portion of the selling price, fixed by Blount as pay for their work. They are paid on a piece work basis indistinguishable from vast numbers of piece work employees.

■ There was some conflict in the testimony before the Board on the question whether Blount or the miners fixed the compensation to the haulers, but the findings that Blount selects and directs them and arranges for the disposition of the tiff they haul and that they receive their portion of the selling price as pay for their work are sustained by substantial evidence, and it is also clear that the proportion of the price which constitutes their pay is fixed by Blount. Though they use their own trucks, their continuing occupation in the mining operations under Blount's control and directions lends support to the Board's conclusion that they are employees within the meaning of the Act. Oliver Iron Co. v. Lord, 262 U.S. 172, 43 S.Ct. 526, 67 L.Ed. 929; Lehigh Valley Coal Co. v. Yensavage, 2 Cir., 218 F. 547, certiorari denied 235 U.S. 705, 35 S.Ct. 282, 59 L.Ed. 434; Bidwell Coal Co. v. David-

son, 187 Iowa 809, 174 N.W. 592, 8 A.L.R. 1058; Combined Metals Reduction Co. v. Industrial Commission, Utah, 116 P.2d 929; National Tunnel & Mines Co. v. Industrial Commission, 99 Utah 39, 102 P.2d 508; Pottorff v. Fidelity Coal Min. Co., 86 Kan. 774, 122 P. 120; Lewis v. Detroit Vitrified Brick Co., 164 Mich. 489, 129 N.W. 726; Arizona-Hercules Copper Co. v. Crenshaw, 21 Ariz. 15, 184 P. 996; Matter of Vcta Mines, 36 N.L.R.B. 288; Matter of Phelps Dodge Corp., 34 N.L.R.B. 846.

The respondents contend in effect that the term "employee" used in the Act should be deemed a word of art taken from the common law and should be given the same meaning as servant in the common law decisions relating to master and servant. Many tort and compensation cases are cited, Missouri having contributed its full share to their great volume. It is contended for the Board that its jurisdiction must be measured by the policy and provisions of the Labor Relations Act and already the list of the Board's decisions in the matter fills two closely printed pages.

In the abstract there can be no doubt that the federal Act establishes a general and uniform jurisdiction over labor relations in the Board which may not be varied or denied by state statutes or decisions, but the question whether persons are or are not employees must always depend upon the particular facts as they are related to the inquiry in which the question is raised. There was no division in the Missouri courts deciding that a tiff miner was an employee of the lessee of the ore lands within the intendment of the Compensation Act (Woodruff decisions, supra), but if the action had been at common law for damages resulting from failure of a master to perform some duty owed to a servant, doubtless other considerations would have been deemed relevant. We are not persuaded that the facts found by the Board on substantial evidence are insufficient to sustain its ultimate finding that the miners and haulers engaged in respondents' business of producing and selling tiff.

Respondents have also attacked the finding of the Board that the respondents through their agent R. A. Blount refused to bargain collectively with the labor union but we think there is no merit in the contentions presented. The respondents have consistently taken the position that no employer and employee relationship exists between them and the miners and haulers

they engage to perform the labor and hauling required in the production and disposition of tiff, and on that ground they refused and continue to refuse collective bargaining. The finding of the Board that such refusal is in violation of Section 8(1) and (5) of the Act is supported by substantial evidence.

This court therefore orders enforcement of the order of the Board and that the respondents comply with the terms thereof.

RIDDICK, Circuit Judge (dissenting).

In so far as the question whether the miners and the haulers of barite ore were employees of the respondents is a question of fact, its decision by the Board, if supported by evidence, is binding on this Court. But "the interpretation of the meaning of the statutes, as applied to justiciable controversies, is exclusively a judicial function." United States v. American Trucking Ass'ns, 310 U.S. 534, 60 S.Ct. 1059, 1064, 84 L.Ed. 1345. And because the finding of the Board in this case, that the miners and haulers were employees of respondents, is not only without evidence in the record to support it, but requires to sustain it an interpretation of the National Labor Relations Act contrary to its evident meaning, I think the petition of the Board for enforcement should be denied.

Respondents own land in Missouri on which barite ore is found. They gave miners permission to enter upon the land to prospect for barite ore and to mine it when discovered. They granted the haulers and the miners the right to enter and remove the ore found by the miners. They exercised no control over either miners or haulers as to the details of the work permitted to be done, and they did not employ either of them, in the common and usual sense of the word employ, to do anything. They did not engage to purchase the ore produced at an agreed price, nor at any price. Under the permission granted by respondents, the miner was at liberty to mine when and where he pleased, at such times and in such manner as suited his whim or interest, using his own tools and following his own notion as to tools needed and methods of work. The haulers were free to work in the same manner as the miners, although it is a fair inference from the evidence that when the miner had ore on hand and a market for it was

available, he requested the hauler to move it to the purchaser.

And there are pertinent provisions of the Missouri mining laws controlling the relation between the miners and haulers and the respondents. Mo.Rev.Stat.(1939) §§ 14783–14786, Mo.R.S.A. §§ 14783–14786. The substance of these statutes may be stated briefly:

The owner of land, if willing to permit mining upon it by persons other than himself and his employees, may give notice, in the manner provided by the statute, of the terms, conditions, and requirements upon which those entering upon the land with the owner's permission may engage in mining operations. If the terms of the statute concerning notice are complied with, those persons entering upon the land with the owner's consent are by law bound by the terms and conditions stated in the notice.

If a landowner permits persons other than his employees to engage in mining operations on his land without giving the notice in the manner and form required by the statute, the persons entering upon the land in good faith are given the right to continue there for a period of three years, together with a right of way over and upon the land for moving the minerals mined. This right is exclusive against the owner and all claiming under him, and is continuous for the term stated unless the miner shall cease operations for more than ten days in any one calendar month, without reasonable excuse or without the consent of the owner, and upon the condition that the miner deliver to the owner, at the mine if he chooses, a royalty upon the minerals mined, the amount of the royalty to be determined by agreement between the miner and the owner, or, if not so determined, to be the same in kind and proportion as is paid or delivered by others mining the same kind of ore on the owner's land or on adjacent lands.

The landowner is given a lien on all minerals mined to secure delivery of the royalty. The miner is given exclusive possession of all ore produced, except the royalty proportion, until he shall have been offered or paid by the landowner the highest price then being paid by the landowner to others for minerals of the same kind. The miner producing minerals and paying or delivering the royalty, may notify the landowner of the amount of ore on hand ready for delivery, and demand that the landowner take and pay for it within five days after service of the notice, at the price stated in the notice. On failure of the landowner to accept and pay for the mineral within the time stated in the notice, the miner acquires absolute title to it and may dispose of it at will.

These Missouri statutes, it will be noted, deal expressly with the relations between a landowner and those permitted to mine on the owner's land, but who are not the owner's employees. Their evident intent and purpose is to protect a miner producing ore on land under a license from the owner, from the consequences of arbitrary action by the owner and the possible loss by the miner of the fruits of his industry and labor. And they fix in such cases the relative rights of the parties and the character of the relation existing between them. Obviously a miner permitted to enter an owner's land is not by the statute made an employee of the owner. The statute, by express provision, applies only when the relation of employer and employee does not exist between the miner and the owner. The miner, following such permissive entry, may, but does not necessarily, become an independent contractor in relation to the owner, as the Missouri courts have held. Woodruff v. Superior Mineral Co., 230 Mo.App. 616, 70 S.W.2d 1104, certiorari quashed 337 Mo. 718, 85 S.W.2d 743. Without more than permissive entry and possession under the statute, the miner is properly the holder of a license coupled with an interest, certainly not an employee. Skidmore v. Haggard, 341 Mo. 837, 110 S. W.2d 726, 729; Restatement, Agency, §§ 2, 220.

It is undisputed that the respondents did not comply with the Missouri statutes concerning notice of the terms and conditions on which miners might enter their lands. Those terms and conditions were therefore fixed by the sections of the statutes controlling in the absence of notice.

The power of Missouri to fix the relative status of landowners and miners in the circumstances stated, in so far as the exercise of that power does not conflict with congressional action under the federal constitution, cannot be doubted. And Missouri interpretations of Missouri statutes are controlling. Lindsey v. Washington, 301 U. S. 397, 57 S.Ct. 797, 81 L.Ed. 1182; Midland Realty Co. v. Kansas City Power & Light Co., 300 U.S. 109, 57 S.Ct. 345, 87 L.Ed. 540. Unless, therefore, there is

something in the National Labor Relations Act bringing the miners and haulers within the purview of that Act, into the classification of employees of respondents, or unless there is something in the conduct of the parties changing their relative status as fixed by the permissive entry and operation under Missouri law, the Board's holding that the miners and haulers were employees of respondent landowners cannot be sustained.

On the argument we were asked by petitioner to discard the common and long-established meanings of the words employer and employee, as used in the National Labor Relations Act, on the ground that they were "legacies from an outmoded craft economy." But in matters of legislative policy the right to pick and choose among legacies from the past belongs to the legislature and not to the courts. And that the Congress in the National Labor Relations Act used the words according to long-established and common acceptation cannot be doubted. The right and occasional necessity for the courts, in the interpretation of acts of the legislature, to resort to considerations of the evident legislative policy and purpose is admitted; also, that the words in acts of the legislature take meaning from their context, which may imperatively call for a restriction or an extension of their common usage. United States v. American Trucking Ass'ns, supra. But where the legislature, as in the National Labor Relations Act, with the policy and purpose of the Act in view and for the specific purpose of removing the necessity of judicial interpretation concerning either the words or the purpose of the Act, defines the meaning of particular words, no justification can possibly be found for judicial or administrative speculation as to their meaning, under the guise of interpretation in aid of a supposed legislative policy.

The Congress was careful to define both employer and employee in the National Labor Relations Act. In both instances the definitions compel the conclusion that the words were used according to common acceptation. Employer is defined as any employer or agent of any employer, with exceptions not material here. Employee is defined as any employee, with exceptions also of no importance here, including persons discharged from employment in violation of the Act. The Act is entitled a Labor Relations Act, and it deals with wages and hours of labor and conditions of employment, the purchasing power of wage earners, and with procedure for collective bargaining by workers with a view to regulations in the public interest of the employer-employee relation for the protection of interstate commerce. The National Labor Relations Board acquired no power or jurisdiction under the Act except where the relation of employer and employee existed.

Nor is there evidence in this record justifying the inference that the parties themselves changed the relation fixed between them by Missouri law. The Board sought to reinforce its holding by arguments based upon certain matters developed in the evidence not relevant to the question under consideration. One of these was the fact that one of the respondent landowners, of which there were four, was engaged in the business of buying and selling the ore produced from respondents' lands. It is not disputed that three of the respondents had no connection whatever with the business of buying and selling the ore. But since the respondent, so engaged, also collected the royalties and distributed them among all the landowners, the Board concluded that all landowners were engaged in the business of "operating" their lands for the production and sale of barite ore. And in reaching this conclusion the Board attached importance to the fact that the respondent who dealt in barite ore issued to the miners the written permission to enter upon the land, and included within each permit the name of a hauler. But the right of an owner of land to say who shall enter upon it is a common incident of ownership, the exercise of which has not heretofore been considered sufficient to establish the relation of employer and employee between the owner and those permitted to enter.

The Board also laid stress upon the fact that the respondent engaged in dealing in ore, sent notices to miners and haulers of the price he was willing to pay for ore and the price he was willing to pay for hauling. A copy of this notice is set out in the majority opinion of the Court. By its terms it applied not only to the miners and haulers on respondents' land, but to all within the mining district. It is nothing more than a quotation of the prices by one in the market for ore, and certainly it is not of itself sufficient to make those who produced, hauled, and sold the ore, em-

ployees of one who purchased it. The offer was to purchase clean, dry ore. Logically under the Board's finding, a miner who produced clean, dry ore was an employee; one whose ore was not clean and dry, was not.

The evidence establishes the fact that it was customary in the mining district involved here for the purchaser of barite ore to account to the owner for his royalty, to the hauler for his hauling charge, and to the miner for his interest. In the light of that prevailing custom, the notice is nothing more than a quotation of the prices for ore and a statement of the quality of ore which would be bought and the proportions of the price which would be paid to the hauler and to the miner. It is idle to contend that either the miner or the hauler was compelled to accept the conditions of the offer in the face of the provisions of the controlling statutes of Missouri to the contrary. If there was any compulsion upon either the miner or the hauler to accept any of the terms of the offer, it was derived, not from any right in respondents to compel acceptance, but rather from the force of unfortunate economic necessity.

One other provision of the Missouri mining law requires attention. The statute provides that all ore mined upon the lands of any person in the state shall be the absolute property of the owner of the land, except in cases where the right of ownership is modified by express contract. Mo. Rev.Stat.(1939) § 14786, Mo.R.S.A. § 14786. But this section must be construed in the light of the sections of the statute discussed above. So construed it is not effective to change the relative rights of miners and landowners in the situation covered by other sections. Missouri courts, with this section of the Act before them, have sustained the rights granted the miner in preceding sections. Woodruff v. Superior Mineral Co., supra.

On the facts stipulated by the parties and found by the Board, as well as because of the plain provisions of Missouri law, the finding of the Board here, that respondents operated a tract of land for the production of barite ore, and engaged miners and haulers in that operation, is wholly without evidence to sustain it. The Board's finding that the permits issued to miners are revocable at will, and that the miners and haulers received a proportion of the market price of minerals pro-

duced as wages earned in the employment of respondents, is in the very teeth of controlling Missouri statutes. The decision of the Board in this case produces a result "plainly at variance with the evident policy and purpose" of the National Labor Relations Act, and one "that is both futile and absurd." Compare United States v. American Trucking Ass'ns, supra. If allowed to stand, it would place an owner of ore bearing lands in the business of producing ore-if he permitted others to go upon his lands to engage in that business. It would make owners employers, and licensees employees, although neither had voluntarily assumed either status and even if both objected. It would override the settled policy of a state in matters within the state's exclusive jurisdiction. It would bring within the purview of the Fair Labor Standards Act of 1938, as employers and employees, landowners and licensees, in the absence of any contract between them requiring the licensees to work or the landowner to pay wages. It obtains this result by giving to the words employer and employee, as used in the National Labor Relations Act, a meaning which the Congress, by careful definition, was at pains to reject.